**EXHIBIT 1**

| | | | |
|---|---|---|---|
| Last Name | Bostic | Page | 1 of 1 |
| First | Da'Jhon | Report Date: | 02/10/2024 |
| Middle | Amaria' | Case Number: | 2024001888 |
| D.O.B. | 06/09/2005 Age 18 | Type of Report: | Supplement to Report |

KANSAS HIGHWAY PATROL

# Incident Narrative Report

| Date of Occurrence | Time | Location | County Abbrev. and Name |
|---|---|---|---|
| 02/10/2024 | 23:11 | Eastbound I70 ramp to 38th St Kansas City, KS 66102 | WY WYANDOTTE |

## Narrative Report

At approximately 2255 hours, Kansas City, MO Police Department (KCPD) patched into REGCOM-28, a mutual aid radio channel. KCPD was in pursuit of a vehicle for Aggravated Assault LEO. The vehicle was a black Kia Sorento bearing Missouri registration RE5F6V. It was later discovered that the Kia was stolen through KCPD. The driver, who was later apprehended, was identified as Da'Jhon A. BOSTIC. BOSTIC advised, after apprehension, that he was on Pre-Trial Release in Missouri for Tampering. The definition of Tampering by Missouri State Law Chapter 569.010 is "to interfere with something improperly, to meddle with it, displace it, make unwarranted alterations in its existing condition, or to deprive, temporarily, the owner or possessor of that thing".

Master Trooper (MSTRP) Garcia and Trooper (TRP) Eddings responded from the 95th Street and I35 area. Shortly after we overheard KCPD coming into Kansas on I670. At that time we were on northbound I635 near Kansas Avenue. We exited to I70 eastbound and turned around on 38th Street to I70 westbound and waited on the ramp to deploy Stop Sticks. The vehicle exited 18th Street northbound to Central Avenue. We attempted to parallel the pursuit and tried to get in front to deploy Stop Sticks. We ultimately located the pursuit at 38th Street and Park Drive westbound.

MSTRP Garcia observed Lieutenant Ramirez deploy Stop Sticks but the driver swerved and avoided them. MSTRP Garcia noticed that the Kia's lights were deactivated. After the Kia passed Lieutenant (LT) Ramirez, it went into the oncoming lanes of Kaw Drive. The Kia then went the wrong way on the ramp from eastbound I70 to Kaw Drive. TRP Irwin was exiting to Kaw Drive from eastbound I70 and saw the Kia. TRP Irwin, using Legal Intervention, rammed the Kia. BOSTIC immediately exited the vehicle from the driver door as MSTRP Garcia and TRP Eddings were approaching on the eastbound ramp to I70 from Kaw Drive. MSTRP Garcia told TRP Eddings to stop the vehicle and he ran after BOSTIC running east down the ramp. Multiple KCPD Officers and TRP Irwin also ran after BOSTIC.

BOSTIC ran northeast through the grass gore area then south across the eastbound ramp and over the guardrail into a tree line. MSTRP Garcia and TRP Irwin were immediately behind BOSTIC running down a hill. BOSTIC fell to the ground and immediately got back up. TRP Irwin ordered BOSTIC back to the ground. When BOSTIC failed to comply with the lawful order MSTRP Garcia tased him with his KHP Issued Taser X2. The taser was effective and BOSTIC fell to the ground. While the taser was going through its cycle KCPD Officers took Bostic into custody. They handcuffed him behind the back with unknown handcuffs. KCPD escorted BOSTIC back up the hill to the scene on the ramp.

MSTRP Garcia and TRP Irwin went back to the scene. At this time all occupants of the vehicle were in custody. TRP Eddings advised MSTRP Garcia that he had taken a female into custody that was sitting near the front left of the vehicle. TRP Eddings also advised that there was a firearm sitting next to the rear left tire of the Kia and that he secured it. The firearm also returned stolen through KCPD. LT Ramirez took pictures of BOSTIC's probe wounds after he was checked out by KCKFD EMS. KCKFD EMS also checked on the other two occupants. TRP Irwin took primary for charging in Kansas.

**For information regarding KCPD's actions during this incident, please refer to KCPD Case #24-0008866**

**For information regarding LT Ramirez's actions during this incident, please refer to his Incident Report**

**For information regarding TRP Eddings' actions during this incident, please refer to his Incident Report**

**For information regarding TRP Kyser's actions during this incident, please refer to his Incident Report**

**For information regarding TRP Irwin's actions during this incident, please refer to his Incident Report**

NOTHING FURTHER TO REPORT

| Reporting Officer | Radio # | Troop | Zone | Reporting Officer Signature |
|---|---|---|---|---|
| P.J. Garcia | 448 | A | B | |

**EXHIBIT 3**

| | | | |
|---|---|---|---|
| Last Name: BOSTIC | KANSAS HIGHWAY PATROL | Page 1 of 3 | |
| First: DA'JHON | | Report Date: 02/10/2024 | |
| Middle: AMARIA' | **Incident Narrative Report** | Case Number: 2024001888 | |
| D.O.B.: 06/09/2005 Age: 18 | | Type of Report: Investigation | |

| Date of Occurrence | Time | Location | County Abbrev. and Name |
|---|---|---|---|
| 02/10/2024 | 23:11 | I070 EASTBOUND MILEPOST 419 FWY KANSAS CITY KS 66101 | WY WYANDOTTE |

## Narrative Report

On 2/10/2024 around 2300 hours I was on duty in Wyandotte County, Kansas, around I-435 and State Ave. I was in a marked Kansas Highway Patrol (KHP) patrol vehicle. The patrol vehicle has "STATE TROOPER" on all sides of the vehicle. The patrol vehicle also has 2 large KHP badges on both the driver and passenger doors and front and back license plates with KHP badges. The patrol vehicle is equipped with a light bar on top and a siren. The patrol vehicle is easily identified as a KHP patrol vehicle. I was also wearing my class B long-sleeve uniform, with a shiny duty belt, Sam brown belt, a KHP badge on the left side of my chest, and KHP patches on both my left and right upper arms. My uniform makes me easily identifiable as a Law Enforcement Officer in the State of Kansas.

While traveling on I-435 northbound, I monitored police radio traffic and REG CMN-28S, a Kansas City Metropolitan Area Mutual aid pursuit channel. As I monitored the radio traffic, REG CMN28S broadcast that the Kansas City Missouri Police Department (KCMOPD) was in pursuit of a black Kia SUV with Missouri registration (RE5F6V) for attempted aggravated assault on an LEO. KCMOPD advised that the Kia attempted to ram a KCMOPD Officer. KCMOPD advised that the Kia had turned off its lights in an attempt to lose the Officers' pursuing. I also heard that Kansas City Missouri Aerial Unit (KCMOAU) 650 was airborne to assist with the pursuit. KCMOPD shortly advised that they would continue the pursuit into Kansas. Based on my training, KCMOPD will only pursue suspects into Kansas for serious felony charges. Myself, LT Ramirez, MSTRP Garcia, TRP Kyser, and TRP Eddings all began to head towards the area to assist with the pursuit.

The pursuit entered Wyandotte County, Kansas, on I-670 westbound from Missouri. Before entering Kansas, a KCMOPD Officer had a successful Stop deployment around the Kansas-Missouri State Line on the right rear tire, causing it to blow out. The Kia fled westbound on I-670 onto westbound I-70, eventually exiting at 421A into the Railroad Yard. The exit sign in bold letters say "NO OUTLETS" and "RAILROAD USE ONLY." This showed that the driver of the Kia was unfamiliar with the area. The Kia drove west through the Railroad Yard and once under 18th ST EXPY it turned around and went eastbound through the Railroad Yard. KCMOAU 650 advised that the Kia was traveling the wrong way up an exit ramp. The Kia was going eastbound on the I-70 westbound exit ramp to the Railroad Yard. Once at the top of the ramp the Kia did a U-turn on I-70 and began to flee westbound on I-70 towards 18th ST EXPY. The Kia exited at 18th ST EXPY and went northbound on 18th ST EXPY from I-70. The Kia then went westbound on Central AVE from 18th ST EXPY. The Kia then got onto Grandview BLVD from Central AVE, still fleeing westbound. From Grandview BLVD, the Kia went southbound on N 24th ST. The Kia then fled westbound on Park DR from N 24th ST. Several law enforcement officers set up for Stop Stick deployment at the intersection of Park DR. and N 38th ST. The Kia went northbound on N 38th ST from Park DR to avoid the Stop Sticks. The Kia then went eastbound on Ohio AVE from N 38th ST. The Kia then fled southbound on N 35th ST from Ohio AVE. The Kia then went westbound on Ford AVE and then back southbound on S 35th ST. The Kia then fled westbound on Park Dr. from S 35th ST going back towards N 38th ST. As the Kia approached N 38th ST again, several other law enforcement officers deployed Stop Sticks. To avoid the Stop Sticks this time, the Kia drove westbound in the eastbound lanes of Park DR. The Kia then began to drive the wrong way on the I-70 eastbound exit ramp to Park DR. At no point were KHP Troopers primary, secondary, or tertiary in the pursuit. At this point, the Kia had committed several traffic infractions and showed a complete disregard for the innocent motoring public by driving into coming traffic several times.

As I was getting into the area and monitoring REG CMN 28S, I made the decision that it was best to stay on I-635 or I-70 and try to get ahead of the pursuit. I made the decision based on my unfamiliarity with the Kansas City Kansas (KCK) Streets and not knowing where the pursuit was exactly. As the Kia was fleeing on westbound Central AVE I decided to set up for a Stop Stick deployment on northbound I-635 and Parallel PRKY. From that location I would be able to deploy Stop Sticks if the Kia attempted to flee back towards Missouri from State AVE or Parallel PRKY, which are major roadways though KCK. As I was sitting at Parallel PRKY tracking the pursuit on maps and monitoring REG CMN-28S I then made the decision to get set up on eastbound I-70 for a Stop Stick deployment. I made this decision since the Kia was staying

| Reporting Officer | Radio # | Troop | Zone | Reporting Officer Signature |
|---|---|---|---|---|
| S. Irwin | 396 | A | B | |

| | | |
|---|---|---|
| Last Name: BOSTIC | KANSAS HIGHWAY PATROL | Page 2 of 3 |
| First: DA'JHON | | Report Date: 02/10/2024 |
| Middle: AMARIA' | **Incident Narrative Report** | Case Number: 2024001888 |
| D.O.B. 06/09/2005 Age 18 | | Type of Report: Investigation |

| Date of Occurrence | Time | Location | County Abbrev. and Name |
|---|---|---|---|
| 02/10/2024 | 23:11 | I070 EASTBOUND MILEPOST 419 FWY KANSAS CITY KS 66101 | WY WYANDOTTE |

## Narrative Report

around Park Dr and N 38th ST. As I was merging onto eastbound I-70 from I-635, KCMOAU 650 advised it looked like the Kia was attempting to get back onto I-70. From my training and knowledge of the area I know Park DR has access ramps to eastbound I-70, and they are commonly used by individuals fleeing from law enforcement. With this information I exited eastbound I-70 to Park Dr with the intention of getting set up for a Stop Stick deployment at the bottom of the ramp if the Kia attempted to flee eastbound on I-70 towards Missouri. At no point was I planning to actively become the primary, secondary or tertiary unit in the pursuit. As I was driving on the exit I heard KCMOAU 650 advised the Kia was driving the wrong way on Park DR through the N 38th ST intersection. I continued down the ramp, I observed a long line of law enforcement vehicles with active lights and sirens on the ramp to eastbound I-70. I then observed a black Kia, being operated without lights, going the wrong way on the exit ramp. The Kia was traveling up the eastbound exit ramp lane to go westbound on I-70 in the eastbound lanes. I know that I-70 is one of the main thoroughfares through the Kansas City Metropolitan Area. The average speed of vehicles on I-70 is 70-80 miles per hour. I knew that if a black-colored vehicle, traveling the wrong way on I-70, with inoperable headlamps, and under the cover of darkness, it could have a catastrophic outcome. I have had extensive training on fatality crashes that were a result of wrong-way drivers that collided with motorists.

I made a split-second decision to conduct a legal intervention with my patrol vehicle. At the time my emergency equipment was not active since I was not actively attempting to get involved in the pursuit, and only trying to get ahead to set up for a Stop Stick deployment. I turned the front end of my patrol vehicle towards the Kia, striking it on the front right quarter panel. The Kia then became disabled, and I observed the driver, Bostic, get out of the driver's seat and flee eastbound on foot from the Kia in Wyandotte County. I exited my patrol vehicle, identified myself as "State Police," and commanded Bostic to "Stop" as he fled on foot in Wyandotte County. Bostic fled northeast on foot through the grassy gore area. As I began to pursue Bostic on foot, I observed him reaching into his waistband. I drew my KHP-issued Handgun and pointed it at Bostic, giving audible commands of "STATE POLICE" and "STOP." Bostic continued to flee, going south across the eastbound ramp, over a guardrail, and into a tree line. I holstered my KHP-issued Handgun and followed Bostic. MSTRP Garcia and several other law enforcement officers assisted in the foot pursuit of Bostic. At one point, Bostic fell, where he was commanded to stay on the ground. Bostic failed to comply. Eventually, MSTRP Garcia deployed his taser, and Bostic was arrested. Two other passengers were taken into custody. The male passenger was identified as Damonta Romance Carter (DOB:02/07/06), who was taken into custody by TRP Kyser. A female passenger identified as Nykeira Bailey (DOB: 03/08/08) was taken into custody by TRP Eddings.

While on scene, it was learned that the Kia with Missouri registration (RE5F6V) had been reported stolen on 2/10/2024 around 1230 hours from 1722 E. 17th TER. in Kansas City, Missouri. The Owner of the Kia is Barbra Johnson, and the Missouri case number for the stolen Kia is (#24-008866). Johnson advised that the Kia was valued around $16,000 thousand dollars. A stolen gun out of Missouri was also located near the Kia's left rear tire. The gun was stolen out of a car at the address of 11234 Corrington Ave. Kansas City, Missouri, 64134. The owner of the gun, Ksean Whitted advised it was stolen from his car on 1/10/2022 between 11am to 12pm. The serial number for the gun is (#BY264801), and the KCMOPD case number is (#22-002709). KCMOPD was on the scene and took possession of the Stolen Gun.

Bostic later advised he was on pre-trail due to a separate criminal charge. Bostic was transported to the Wyandotte County Jail by KCKPD and lodged on a 48-hour hold. I then completed an arrest affidavit for criminal violations committed in Kansas. They include Felony Flee and Elude (avoid tire deflation device), Felony Flee and Elude (drive the wrong way into opposing lane/intersection), Felony Flee and Elude (operate a stolen vehicle), Felony interference, Possession of Stolen Property (value $1,500-$25,000), and Possession of Stolen Property (Firearm with value less than $25,000).

The Kia and my Patrol Unit #580 both sustained disabling damage to the front side areas of the vehicles. Santa Fe Tow towed both vehicles from the scene. Since there was an open case on the stolen Kia, a hands off hold was placed on it. A

| Reporting Officer | Radio # | Troop | Zone | Reporting Officer Signature |
|---|---|---|---|---|
| S. Irwin | 396 | A | B | |

| | | | |
|---|---|---|---|
| Last Name BOSTIC | KANSAS HIGHWAY PATROL | Page 3 of 3 | |
| First DA'JHON | | Report Date: 02/10/2024 | |
| Middle AMARIA' | **Incident Narrative Report** | Case Number: 2024001888 | |
| D.O.B. 06/09/2005 | Age 18 | Type of Report: Investigation | |

| Date of Occurrence | Time | Location | County Abbrev. and Name |
|---|---|---|---|
| 02/10/2024 | 23:11 | I070 EASTBOUND MILEPOST 419 FWY KANSAS CITY KS 66101 | WY WYANDOTTE |

## Narrative Report

tow inventory was not completed due to the hands off hold. The Kia was eventually released back to the registered owner. The My patrol unit was towed to Kansas Highway Patrol Troop A Headquarters.

For more information on KCMOPD actions during the incident, please refer to KCMOPD Case #24-0008866.

For more information on LT Ramirez's actions during the incident, please refer to his Incident Report.

For more information on MSTRP Garcia's actions during the incident, please refer to his Incident Report.

For more information on TRP Kyser's actions during the incident, please refer to his Incident Report.

For more information on TRP Eddings' actions during the incident, please refer to his Incident Report.

DO NOT REPRODUCE
This Information Is Limited To
Authorized Personnel Only

| Reporting Officer | Radio # | Troop | Zone | Reporting Officer Signature |
|---|---|---|---|---|
| S. Irwin | 396 | A | B | |

EXHIBIT 8







KANSAS HIGHWAY PATROL

EXHIBIT 10



Case Number 2024001888

# Active Pointing / Response to Resistance Report

| Date Offense Occurred | Time (24 Hour Military) | Location | Troop | County |
|---|---|---|---|---|
| 02/10/2024 | 23:11 | Eastbound I70 ramp to 38th St Kansas City, KS 66102 | A | WY |

## Active Pointing

| Officer Involved | Radio No. | Suspect Name (Last, First, Middle) |
|---|---|---|
| | | |

Weapons System Used:

Justification for Pointing: | Other Justification:

## Response to Resistance Incident

| Officer Involved | Radio No. | Body Armor Worn | Photos Taken: | Taken By: |
|---|---|---|---|---|
| P.J. Garcia | 448 | ☒ Yes ☐ No | ☒ Yes ☐ No | K246 |

| Suspect Name (Last, First, Middle) | Address |
|---|---|
| Bostic Da'Jhon Amaria' | 6329 S Benton Ave Kansas City MO 64132 |

| Race | Sex | Ethnicity | Date of Birth | Age | Apparent Condition of Suspect: |
|---|---|---|---|---|---|
| B | M | N | 06/09/2005 | 18 | Normal |

Officer Activity:

- ☒ Traffic Pursuit or Stop
- ☐ Investigating Suspicious Person/Circumstances
- ☐ Attempting Other Arrest(s)
- ☐ Civil Disorder
- ☐ Transporting / Handling Prisoner
- ☐ Other

Was suspect arrested for Assault on LEO, Agg. Assault on LEO, Battery on LEO, Agg. Battery on LEO? ☐ Yes ☒ No ***** REQUIRED*****

## Reason

Physical Control/Weapon Was Used To: (check all applicable boxes)

- ☒ Take Custody of Suspect
- ☐ Maintain or Regain Control of Suspect
- ☐ Protect Self
- ☐ Protect Another Person
- ☐ Other ____________________

## Charges

KHP Arrest Made: ☐ Yes ☒ No

Indicate primary charge(s) necessitating custodial arrest of subject:

K.S.A. 08-1568(b1)(F)(c2) K.S.A. 08-1568(b1)(B)(c2) K.S.A. 21-5801(a)(4)(b7) K.S.A. 21-5904(a4)(b6)(B)

## Level of Resistance

- ☐ Unarmed suspect resisted control; holds/take-downs/wrestling were employed.
- ☐ Unarmed suspect resisted control; blows were struck, no police weapons used.
- ☒ Unarmed suspect resisted control; police weapon(s) employed.
- ☐ Suspect armed with club/similar weapon threatened/attacked officer/others.
- ☐ Suspect armed with knife/similar weapon threatened/attacked officer/others.
- ☐ Suspect assaulted officer/others with motor vehicle.
- ☐ Suspect armed with firearm threatened/shot at officer/others.
- ☐ Suspect armed with explosive device.
- ☐ Suspect armed with weapon resisted control but did not use weapon.
- ☐ Suspect escaped
- ☐ Other (Specify) ____________________

## Weapons

Weapons Used by Suspect(s):

- ☒ None
- ☐ Hands
- ☐ Feet
- ☐ Teeth
- ☐ Club
- ☐ Handgun
- ☐ Shotgun
- ☐ Rifle
- ☐ Knife
- ☐ Automatic Weapon
- ☐ Explosive Device
- ☐ Vehicle
- ☐ Officer's Weapon
- ☐ OC Spray
- ☐ Conducted Energy Weapon
- ☐ Other (Specify) ____________________

Weapons Used by Officer(s):

- ☐ None
- ☐ Hands
  - ☐ Neck Restraint
  - ☐ Wrestled
- ☐ Feet
- ☐ Baton
- ☐ Flashlight
- ☐ OC Spray
- ☐ Tear Gas
- ☒ Conducted Energy Weapon
  - ☒ Probes
  - ☐ Drive "Touch" Stun
- ☐ Less-Lethal (Specify) ____________________
- ☐ K-9
- ☐ Duty Handgun
- ☐ Non-Issue Firearm
- ☐ Shotgun
- ☐ Rifle
- ☐ Automatic Weapon
- ☐ TVI
- ☐ Legal Intervention with Vehicle
- ☐ Roadblock
- ☐ Ramming
- ☐ Rolling Roadblock
- ☐ Other (Specify) ____________________

| Reporting Officer | Radio # | Date | Reviewed By | Further Review Recommended |
|---|---|---|---|---|
| P.J. Garcia | 448 | 02/10/2024 | LT. GUSTAVO RAMIREZ | ☐ Yes ☒ No |

Case Number
2024001888

## Effect

| Suspect | Officer | |
|---|---|---|
| ☐ | ☐ | No visible injury; no complaint of pain. |
| ☐ | ☐ | No visible injury; complaint of minor pain, no medical treatment required. |
| ☒ | ☒ | Minor visible injury (redness, swelling, abrasion); no medical treatment required. |
| ☐ | ☐ | Injury requiring outpatient medical treatment (stitches, x-rays, doctor's exam). Where treated: |
| ☐ | ☐ | Injury requiring overnight hospitalization. Where: |
| ☐ | ☐ | Fatal |
| ☐ | ☐ | Transportation of injured by emergency medical services. Who: |

**1.** How long was the subject face down while restrained:

Approximately 45 seconds

**2.** How was the subject transported and in what position was the subject during transport:

Handcuffs behind back, KCKPD transported

**3.** How long did the transport phase last and what observations were made of the subject's condition:

Unknown, KCKPD transported

**4.** Duration of physical combat:

Approximately 30 seconds

**5.** System or type of postarrest restraint employed:

Unknown type handcuffs behind the back

**6.** Names of attending medical personnel:

KCKFD EMS

DO NOT REPRODUCE
This Information Is Limited To
Authorized Personnel Only

Case Number 2024001888

**CONDUCTED ENERGY WEAPON (CEW) DEPLOYMENT**

Serial #: X2900CTYT    Cartridge #: C620A0985

| Question | Answer |
|---|---|
| Effective? | [X] Yes [ ] No [ ] Limited |
| Were further control methods needed? | [ ] Yes [X] No |
| Was this a projectile / probe deployment? | [X] Yes [ ] No |
| Was this a direct contact / drive stun contact? | [ ] Yes [X] No |
| Was an additional cartridge deployed? | [ ] Yes [X] No |
| Was a follow-up 3rd point contact conducted? | [ ] Yes [X] No |
| Did the probe(s) penetrate the subject's skin? | [X] Yes [ ] No |
| Was the subject wearing heavy clothing? | [ ] Yes [X] No |
| Was this an accidental (unauthorized) discharge? | [ ] Yes [X] No |

| Approximate distance from subject: | Reason not effective: |
|---|---|
| 5 feet | |

| # of cartridges used: | # of Drive "Touch" Stuns: | Duration of cycles: |
|---|---|---|
| 1 | 0 | Automated |

| # of probes deployed: | # of probe hits: | # of cycles through the probes: |
|---|---|---|
| 2 | 2 | 1 |

Cover Officer Name and Radio Number:
S. Irwin

Name and Radio Number of Officer taking custody of CEW after deployment:
P.J. Garcia 448

Additional comments:

**INDICATE IMPACT AREAS**
(check one)

Face: [ ] Ear, Right [ ] Eye, Right [ ] Cheek, Right [ ] Forehead [ ] Nose [ ] Mouth [ ] Chin [ ] Ear, Left [ ] Eye, Left [ ] Cheek, Left



**EFFECTS OF LESS-LETHAL (LL) MUNITIONS**

| Effective? | Reason not effective | Were further control methods needed? |
|---|---|---|
| [ ] Yes [ ] No [ ] Limited | | [ ] Yes [ ] No |

Approximate distance from subject:
________ feet

| Number of LL rounds deployed: | Number of hits: | Number of misses: |
|---|---|---|
| | | |

| Number of times LL system used: | Number of LL munitions recovered and collected as evidence: |
|---|---|
| | |

Cover Officer Name and Radio Number:

Additional comments:

**INDICATE IMPACT AREAS**
(check one)

Face: [ ] Ear, Right [ ] Eye, Right [ ] Cheek, Right [ ] Forehead [ ] Nose [ ] Mouth [ ] Chin [ ] Ear, Left [ ] Eye, Left [ ] Cheek, Left



## SUPERVISORY REVIEW

| IMMEDIATE SUPERVISOR: | SIGNATURE | DATE |
|---|---|---|
| LT. GUSTAVO RAMIREZ | | 02/21/2024 |

**RESPONSE TO RESISTANCE REVIEW:**

Policy Violation(s) Observed: ☐ Yes ☒ No    Training Recommendations: ☐ Yes ☒ No    Equipment Issues Observed: ☐ Yes ☒ No

On 02/10/2024 at approximately 2300 hours REG CMN-28S, a Kansas City Metropolitan Area mutual aid pursuit channel, broadcasted that the Kansas City Missouri Police Department (KCMOPD) pursued a black Kia SUV. KCMOPD advised their charges were Attempted Aggravated Assault on a Law Enforcement Officer. The Kia eventually fled across state lines and into Kansas. MSTRP Garcia and his trainee TRP Eddings, responded to the area to assist in the apprehension of the fleeing suspect(s). KCMOPD, Cass County Sheriff's Department, and KCKPD all assisted in the attempted apprehension of the suspect(s). Near the area of Park Drive/38th Street and I70, the suspect drove the wrong way on the ramp to I70. TRP Irwin performed a legal intervention which disabled the Kia. The suspected driver was not fazed by the intervention, exited the Kia, and proceeded to flee on foot into a wooded area. MSTRP Garcia and TRP Irwin pursued on foot while verbally identifying themselves as, "State Police." MSTRP Garcia reported the suspect fell on the ground and he commanded him to stay on the ground. The suspect failed to comply and MSTRP Garcia reported deploying his KHP issued Taser using the projectile/probes function. The deployment was effective and induced NMI. TRP Irwin along with other backing officers took custody of the suspect without further incident.

I have reviewed TRP Eddings' and TRP Irwin's patrol car video. MSTRP Garcia was in TRP Eddings' patrol vehicle. There is no audio since TRP Eddings is in training and wore the mic pack. The Use of Force occurred outside of the patrol camera's view and is not visible. All monitors were activated during this incident. MSTRP Garcia notified KHP Dispatch of his Use of Force shortly after deploying his Taser. I observed no violations of KHP Policy and Procedure or Kansas State Law. The force used by MSTRP Garcia was reasonable, appropriate, and necessary to take the resistant suspect into custody, protect himself, and prevent the suspect from fleeing.

| TROOP OPERATIONS COMMANDER: | SIGNATURE | DATE |
|---|---|---|
| I. Ingram | | 02/25/2024 |

A Conducted Energy Weapon (CEW) is designed to disrupt a subject's motor and sensory nervous system by means of deploying battery-powered electrical energy, sufficient to cause uncontrolled muscle contractions and override an individual's voluntary motor response. I have reviewed Trooper Eddings in car video system, as MSTRP Garcia was riding with him as his field training officer that evening. The event was not captured on video. The Taser download has been completed and submitted to KHP's professional standards unit. No violation of Kansas Highway Patrol policy was observed.

**USE ADDITIONAL SHEETS IF NECESSARY**

EXHIBIT 11

# Kansas City Kansas Police Department

## ARREST INFORMATION SHEET

CASE# **2024-00011811**

### DETAILS

| ARREST DATE/TIME | ARREST TYPE | ARRESTING OFFICER |
|---|---|---|
| 02/10/2024 22:51 | Taken Into Custody | 2190 Corgiat |

LOCATION OF ARREST: KAW DR TO EB I-70/US-24/40 HWY DR Kansas City, KS

### ARRESTEE

NAME (JACKET TYPE/LAST, FIRST, MIDDLE SUFFIX): Bostic, Dajhon Amaria    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

| DOB | AGE | ADDRESS (STREET, CITY, STATE, ZIP) |
|---|---|---|
| 06/09/2005 | 18 | 6329 S Bethany AVE Kansas City, MO 64132 |

| RACE | SEX | HEIGHT | WEIGHT | HAIR | EYE |
|---|---|---|---|---|---|
| Black | Male | 5'08" | 158 | Black | Brown |

| DL NUMBER/STATE | PRIMARY PHONE | PHONE #2 | PHONE #3 |
|---|---|---|---|
| | Mobi (816)335-7874 | | |

### CHARGES

| | STATUTE / DESCRIPTION | COUNTS | ATTEMPT/COMMIT |
|---|---|---|---|
| 01 | 08-1568(a1)(Bc)(1A) Fleeing or attempt to elude a law enforcement officer; eluding pursuing; 1st conviction | 1 | Completed |
| 02 | 21-5412(d)(1) Aggravated assault of LEO; Use of a deadly weapon | 1 | Completed |
| 03 | 21-5904a(a3) Interference w/ LEO; Misd obstruction | 1 | Completed |
| 04 | 21-5801(a)(4)(b3) Possession of stolen property; Value $1,500 to $25,000 | 2 | Completed |
| 05 | 21-6304(a)(2)(Bb) Criminal possession of a weapon by felon; firearm not used in the commission of crime | 1 | Completed |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

### NARRATIVE

On 02/10/2024 at 2251 hours I, Ofc. Corgiat #2190, responded to the area of I-70 EB and the Park / 38th Street exit to assist at the termination point of a pursuit. KCMO, KHP, and Cass County had several parties in custody.

I transported the arrestee on behalf of the pursuing agencies. Reference their report KCPD #

| REPORTING OFFICER | DATE | REVIEWED BY |
|---|---|---|
| 2190 Corgiat, Michael | 02/10/2024 | |

# Kansas City Kansas Police Department

**ARREST INFORMATION SHEET** CASE# **2024-00011811**

## ARREST NARRATIVE (continuation)

24008982.

The arrestee was taken to WYCO jail for booking on a 48 hour hold in reference to the listed charges.

| REPORTING OFFICER | DATE | REVIEWED BY |
|---|---|---|
| 2190 Corgiat, Michael | 02/10/2024 | |

EXHIBIT 12

# Booking Report

## BOSTIC, DAJHON AMARIA

| Jacket No. | Booking No.: | SSN: | Cell: |
|---|---|---|---|
| 186480 | 2024000725 | 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 | INTAKE I 1 |

**Address:**
6329 SOUTH BENTON BLVD
KANSAS CITY, MO, 64132

**Employment Information:**
UNEMPLOYED
Kansas City, mo

**Marital Status:** SINGLE

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 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



BOSTIC, DAJHON AMARIA

| Sex | Race/Ethnicity | Age | Birth Date | Phone |
|---|---|---|---|---|
| MALE | B | 18 | 06/09/2005 | (816) 335-7874 |

| Eyes | Hair | Height | Weight | Build | Skin |
|---|---|---|---|---|---|
| BROWN | BLACK | 5' 8" | 158 | MEDIUM | BROWN |

6/9/24

**Alias:** Dajhon Bostic SR, Hill, Jayzire, Dajon A Bostic, Dajhon Bostic, Dayhon A Bostic SR

**Drivers License #:** - 125F016007

**Features:** Mustache, goatee

| Arrest Date: | Book Date: |
|---|---|
| 2/11/24 0:30 | 02/11/2024 00:30 |
| **Arresting Officer** | **Pre-Book Officer** |
| CORGIAL #2190 | CARROLL, CATHERYN M |
| **Arresting Agency:** | **Booking Officer** |
| KCK PD | BILYEU, ROGER J |
| **Where Arrested** | **Searching Officer** |
| WYANDOTTE COUNTY | |
| **Cross Street:** | |
| | |

| Billing Agency: | FBI # |
|---|---|
| | EVWC5MCP3 |
| **Badge #:** | **State #** |
| 1853 | KS34004729 |
| **Badge #:** | **State Alt #** |
| 1814 | MO24429337 |
| **Birth State:** | **AFIS #** |
| IL | [illegible] |
| **Birth County:** | **Alien #** |
| UNITED STATES | |

186480

| Case No | Code | Description | Disposition |
|---|---|---|---|
| 202400011811 | 08-1568(c)(1) | Fleeing or attempt to elude a law enforcement officer; 1st conviction | 48HR |
| 202400011811 | 21-5412(d)(1) | Aggravated assault of LEO; Use of a deadly weapon | 48HR |
| 202400011811 | 21-5904(a)(2) | Interference with LEO; Obstruct or resist in misdemeanor case | 48HR |
| 202400011811 | 21-5801(a)(4)(B3) | Possession of stolen property; Value $1,000 to $25,000 | 48HR |
| 202400011811 | 21-6304(a)(3)(B) | Criminal poss of firearm by felon; Non-person fel conv, firearm not used in crim | 48HR |

| Bond Amount | Bond Type | Agency | Bond Status |
|---|---|---|---|
| 0.00 | NO BOND | | NO BOND |

| Detainer Description | Agency | Expires |
|---|---|---|
| | | |

√AS 6190 5-22-24
Indv 5-26-24 2872 vpd

Officer Signature: Bilyeu 1814

Inmate: D Dajhon Amaria Bostic

WYANDOTTE COUNTY DETENTION CENTER
*BluHorse Jail Management System*

Printed on 2/11/2024 @ 0:50
custom BookingReport.rpt

| Booking No: | Jacket No: | Book Date: | AFIS Transaction #: |
|---|---|---|---|
| 2024000725 | 186480 | 02/11/2024 00:30 | 3105A2400627 |
| Sex: MALE | Race: B | Build: MEDIUM | Skin: BROWN |
| Eyes: BROWN | Hair: BLACK | Height: 5' 8" | Weight: 158 |



| Release Date: | Release Type: | Released To: |
|---|---|---|
| 5/22/24 13:50 | FINAL RELEASE | |

| Released By: | Physical Releasing Officer: |
|---|---|
| KRESYMAN, CHANCI | |

Release Reason:
TRANSFER TO ANOTHER COUNTY

Release Comments:
rel to jackson co so mo

X Da'Jhon Bostic
Inmate Signature

X 936
Releasing Officer

Supervisors Approval 1910 Time 1352

Officers signature on Transfer/Release escort #96 Time 1355

WYANDOTTE COUNTY DETENTION CENTER
*BluHorse Jail Management System*

Printed on 5/22/2024 @ 13:50
ReleaseWCDC.rpt

EXHIBIT 13

| SUBJECT | POLICY NUMBER |
|---|---|
| **RESPONSE TO RESISTANCE** | **ENF-04** |
| | EFFECTIVE DATE |
| | **03/05/25** |
| APPLICABLE CALEA STANDARDS | RESCINDS |
| **4.1.1, 4.1.2, 4.1.4, 4.1.5, 4.2.1, 4.2.2, 4.2.3, 4.3.4** | **ENF-04** |
| | DATE |
| | **04/17/24** |

## I. PURPOSE

To establish guidelines and policies governing the response to resistance encountered by officers of the Kansas Highway Patrol.

## II. POLICY

To place the highest value on human life and the safety of the public and Patrol employees, thereby using only the level of response which is reasonable and necessary to accomplish lawful purposes.

## III. DEFINITIONS

**ACTIVE AGGRESSION -** Physical actions indicative of assault.
**ACTIVE POINTING -** The intentional aiming of a firearm, CEW, or less-lethal munitions launcher at a person. This does not include the "low-ready position."
**ACTIVE RESISTANCE -** Actions such as moving away or pulling away, which are overt attempts to avoid the officer's control, but do not attempt to harm the officer.
**ADMINISTRATIVE REVIEW -** A documented review of an incident prepared for the Superintendent or their designee that indicates whether policy, training, equipment, or disciplinary issues should be addressed.
**AGGRAVATED ACTIVE AGGRESSION -** Use of deadly force to resist.
**VASCULAR NECK RESTRAINT -** A weaponless control technique utilizing bilateral compression of the carotid arteries to gain compliance from combative suspects with less chance of injury. This technique was previously referred to as the "Carotid Neck Restraint," and it is not a chokehold.
**CHOKEHOLD -** A technique that inhibits an individual's breathing by compression of the airway in the neck. The vascular neck restraint, when properly applied, is not considered a chokehold.
**CONDUCTED ENERGY WEAPON (CEW) -** Weapons designed to disrupt a subject's motor and sensory nervous systems by means of deploying battery-powered electrical energy sufficient to cause uncontrolled muscle contractions and override an individual's voluntary motor responses established herein. These weapons have a lessor likelihood of serious injury, death, or permanent disability than higher levels of force.
**DEADLY FORCE -** Any use of force that creates a substantial risk of causing death or serious bodily injury.
**DE-ESCALATION -** Taking action or communicating verbally or non-verbally during a potential force encounter in an attempt to stabilize the situation and reduce the immediacy of the threat so that more time, options, and resources can be called upon to resolve the situation without the use of force or with a reduction in the force necessary. De-escalation may include the use of such techniques as command presence, advisements, warnings, verbal persuasion, and tactical repositioning.
**EMPTY HAND HARD -** Physical control methods that have a probability of injury. These methods are applied when lesser forms of control have failed or when not applicable because the subject's resistance level was at a perceived, dangerous level.
**EMPTY HAND SOFT -** Physical control methods that command compliance with minimal possibility of injury. These methods are used to control passive or demonstrator types of resistance and defensive resistance.

**IMMINENT -** An appearance of threatened or impending injury as would put a reasonable and prudent person to their instant defense.
**IMPACT WEAPONS -** Impact weapons include, but are not limited to, a baton, flashlight, and less-lethal munition launcher. Impact weapons are tools that provide a means by which officers can defend themselves or others from injury. Escalation to an impact weapon is warranted when the officers is encountering active resistance, active aggression, or aggravated active aggression.
**INTERMEDIATE WEAPONS -** Intermediate weapons include, but are not limited to, OC spray, conducted energy weapons (CEW), a baton, tactical vehicle intervention (TVI), or other tools to apply leverage or locks to the limbs or joints for control or takedowns. Intermediate weapons are tools that provide a means by which officers can defend themselves or others from injury.
**OBJECTIVELY REASONABLE -** A legal standard reflecting that an officer's actions were reasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation.
**OLEORESIN CAPSICUM (OC) SPRAY -** Oleoresin capsicum spray is a non-lethal aerosol agent derived from cayenne pepper. The primary target area is the eyes which can cause temporary vision impairment, skin irritation, and disrupt normal breathing. These weapons have a lessor likelihood of serious injury, death, or permanent disability than higher levels of force.
**OFFICER PRESENCE -** Identification and representation of police authority.
**OUTPATIENT MEDICAL TREATMENT -** Patient who receives medical treatment without being admitted to a hospital.
**PASSIVE RESISTANCE -** Physical actions such as gripping an object, tensing up, or linking arms which do not prevent an officer’s attempts to control.
**PSYCHOLOGICAL INTIMIDATION -** Non-verbal cues indicating the subject’s attitude and readiness to resist.
**REASONABLE BELIEF -** The facts or circumstances the officer knows, or should know, which would cause an ordinary and prudent officer to act or think in a similar way under similar circumstances.
**SERIOUS BODILY INJURY -** A bodily injury that creates a substantial risk of death, causes serious protracted and obvious disfigurement, or results in long-term loss or impairment of any bodily member or organ**.**
**SHOW OF FORCE -** A demonstration of the force options at one’s command and of one’s readiness to use them.
**VERBAL DIRECTION -** Verbal direction or commands.
**VERBAL NON-COMPLIANCE -** Verbal responses indicating unwillingness to comply or threats.

## IV. GENERAL PROVISIONS

A. Authority for law enforcement officers to respond to resistance while making an arrest is contained in K.S.A. 21-5227.
B. Unless expressly prohibited elsewhere, officers may use appropriate response to resistance techniques in specific circumstances:
   1. Effecting a lawful arrest
   2. Execution of legal process
   3. Enforcing an order of the court
   4. Performing any other duty imposed by law
   5. Bringing an unlawful situation under control
      a. Officers will only use reasonable force to accomplish lawful objectives.
C. De-escalation
   1. The response to resistance shall be de-escalated or discontinued when that level of force is no longer necessary.
   2. An officer should attempt to use de-escalation techniques prior to utilizing a higher level of force when appropriate.

3. Whenever possible and when such delay will not compromise the safety of the officer, result in the destruction of evidence, the escape of a suspect, or the commission of a crime, an officer should allow an individual a reasonable amount of time to submit to verbal commands before force is used.
4. Officers shall apply de-escalation techniques when possible. These techniques may include effective communication, using distance and cover to create time, recognition of persons in crisis and acknowledgment of their circumstances, and "slowing down" situations that do not pose an immediate threat. (4.1.1)

D. The circumstances permitting lethal force include the following factors: (4.1.2)
   1. When an officer reasonably believes that the action is in defense of any human life or there is an imminent danger of death or serious bodily injury.
   2. The suspect is attempting to escape by the use of a deadly weapon.
   3. The use of lethal force is neither justified nor authorized to prevent the escape of felony suspects posing no imminent threat to officers and no threat to others.

E. Appropriate medical aid shall be rendered as quickly as reasonably possible following any law enforcement action in which injuries have been sustained. Persons against whom an officer has applied response to resistance techniques (including injuries sustained during apprehension) shall be afforded appropriate medical assistance as dictated by:
   1. Amount and type of response used;
   2. Any apparent or probable injuries;
   3. Statements made by the person.

F. When obvious severe injuries have occurred, medical distress is apparent, or the individual is unconscious, emergency medical personnel shall be summoned and appropriate medical aid (consistent with the level of training of employees on scene) shall be provided.

G. Duty to Intervene (1.2.10)
   1. Officers are expected to use independent, articulable, objectively reasonable force when making decisions regarding the need and appropriateness of the force to be used.
   2. Any officer present and observing another officer using force that is obviously illegal or clearly beyond that which is objectively reasonable under the circumstances shall, when in a position to do so, safely intercede to prevent the use of such force. The action required by the officer will depend on the circumstances of the incident. Appropriate action may include, but is not limited to:
      a. Verbal or physical intervention;
      b. Immediate notification to a supervisor, and/or
      c. A direct order by a supervisor to cease the use of force.
   3. Upon observing another agency employee or public safety associate engage in any unreasonable use of force or upon becoming aware of any violation of Patrol policy, state law, federal law, or local ordinance, agency employees shall intervene and immediately notify a KHP uniformed supervisor.
   4. Intervention must be immediate when employees encounter unreasonable actions that could result in injury, death, or violations of constitutional or civil rights.
   5. Intervention in other circumstances, such as conduct unbecoming of an employee, may best be handled through reporting the matter to the appropriate supervisory or administrative authority.
   6. Intervention by non-sworn agency employees shall not include physical intervention.
   7. Public safety associates may include, but are not limited to:
      a. Members of task forces with which the Patrol works;
      b. Members from other agencies with shared or concurrent jurisdictions;
      c. Agency volunteers; and
      d. Representatives from support organizations within the broader criminal justice system.

H. Annual Training (4.3.3)
   1. All sworn personnel shall receive annual in-service training on this policy.

## V. RESPONSE TO RESISTANCE FORCE OPTIONS

A. When a response to resistance becomes necessary, officers should consider a force option that is reasonably necessary to gain compliance:
   - Officer's presence
   - Verbal requests and/or commands
   - Intermediate Weapons:
     - OC spray (EQP-12)
     - Conducted Energy Weapon (CEW) (EQP-13)
     - Baton or other tools to apply leverage or locks to the limbs or joints for control or takedowns
     - Tactical Vehicle Intervention (TVI)
   - Empty hand soft
   - Empty hand hard
   - Vascular Neck Restraint (EQP-12)
   - Impact Weapons:
     - Baton
     - Flashlight
     - Less-lethal munition launcher
   - Firearms and other forms of deadly force, including the use of a vehicle as a weapon

B. Officers are not narrowly restricted to the force options listed herein. The reasonableness of a particular force option must be judged from the perspective of the officer on the scene. The proper level of response requires careful attention to the facts and circumstances known to the officer at the time.

C. It is understood that many variables may affect an officer's decision in escalating or de-escalating the force option used. Force options may include but are not limited to the following:
   1. The person's size, gender and age
   2. Exhaustion and/or injury
   3. Number of suspects
   4. Number of officers
   5. Availability of weapons
   6. Imminent jeopardy

D. Each application of force (including individual agency-approved impact weapons strikes and individual CEW deployments) must be evaluated under the totality of the circumstances. The officer should consider the following non-exclusive list of factors:
   1. The severity of the crime at issue
   2. Whether the suspect poses an immediate threat to the safety of the officer(s) or others
   3. Whether the suspect is actively resisting arrest or attempting to evade arrest by flight

E. Levels of resistance may include, but are not limited to:
   1. Psychological intimidation
   2. Verbal noncompliance
   3. Passive resistance
   4. Active resistance
   5. Active aggression
   6. Deadly force assaults

## VI. PROHIBITED USES OF FORCE

A. Officers shall not use force to attempt to effect compliance with an order or command that is clearly unlawful.
B. Officers shall not use physical force against an individual who only verbally confronts them unless the vocalization impedes a legitimate law enforcement purpose.
C. Officers shall not use force on restrained subjects except when the subject's actions must be immediately stopped to prevent injury, escape, or destruction of property.
D. Officers shall not use any type of chokehold which restricts the person's airway unless deadly force would be authorized. (4.1.7)

## VII. REPORTING REQUIREMENTS

A. Active Pointing
   1. Any officer who intentionally aims a firearm, CEW, or less-lethal munition launcher at a person shall complete the Active Pointing section of the HP-132.
   2. Officers shall also complete an Incident Narrative Report HP-133 to supplement the Active Pointing section of the HP-132.
   3. If additional force is used on a subject (beyond active pointing), the entire Response to Resistance Report shall be completed.
B. Response to Resistance Incidents
   1. The Response to Resistance Incident section of the HP-132 and an Incident Narrative Report HP-133 shall be completed in the following circumstances:
      a. Discharging a firearm for other than training, recreational purposes, or euthanizing an injured animal; (4.2.1 a)
      b. An action that results in, or is alleged to have resulted in, injury or death of another person (In instances in which serious bodily injury or death results from an officer's response to resistance, the outside agency's investigative transcript may be substituted for the Narrative Report HP-133); (4.2.1 b)
      c. Applying force through the use of lethal, less-lethal weapons, or weaponless physical force (which is defined above as empty hand hard and empty hand soft); (4.2.1. c, d)
      d. Vascular Neck Restraint; (4.2.1 d)
      e. A person complains of injuries alleged to have been received in a response to resistance incident;
      f. Weapons are employed by or against the officer, including the use of a patrol vehicle to affect a forcible vehicle stop; (4.2.1 c)
      g. When directed to do so by a Patrol supervisor. (4.2.1)
   2. A response to resistance incident causing death or serious physical injury to the officer or another shall be reported to the appropriate troop supervisor as soon as possible.
   3. Such notification shall be the responsibility of the involved officer if possible, or if not, the first back-up officer to arrive on the scene.
   4. In the interest of protecting the officer and agency from unnecessary liability, it is strongly recommended that photos be taken of injuries sustained by any subject against whom some level of response is employed.
C. Timeliness of Reporting
   1. All Response to Resistance (HP-132) and Incident Narrative Reports (HP-133) shall be completed and submitted into workflow within 48 hours of the incident.
      a. Exceptions include:
         1) B.1.b above.

2) If a response to resistance results in an Officer being placed on leave, the Response to Resistance Report (HP-132) shall be completed within 48 hours of their return to duty.
3) The Superintendent may authorize the Response to Resistance Report (HP-132) to be completed by the Officer's supervisor.

## VIII. SUPERVISOR RESPONSIBILITY

A. An administrative review of all response to resistance incidents shall be conducted by the involved officer's first and second level supervisors to ensure the facts involved are completely and accurately reflected and documented in the Supervisory Review Section. The review shall include whether policy, training, equipment, or disciplinary issues should be addressed. (4.2.2)
B. Response to resistance incident reports shall be reviewed and approved by the involved officers first and second level supervisors and submitted to the Records Section and Professional Standards Unit within 15 days of the incident date.
C. When a complaint of excessive force or other related misconduct is received by the agency at any time during the normal 15-day supervisory review period, the supervisory review will stop, and the Professional Standards Unit will investigate and determine whether policy, training, equipment, or corrective action/disciplinary issues should be addressed.
D. The Superintendent at their discretion may appoint a Response to Resistance Review Panel for any incident to determine if the facts involved are completely and accurately recorded, and indicate whether policy, training, equipment, or disciplinary issues should be addressed.
E. A response to resistance incident causing death or serious physical injury to any party shall be administratively investigated by the agency concurrent with a criminal investigation by an outside agency as requested by the Superintendent.
F. The commander of the Professional Standards Unit shall be responsible for completing and submitting, on behalf of the agency, a "Monthly Law Enforcement Officers Killed and Assaulted Supplementary Report" to the Kansas Bureau of Investigation as required by the Kansas Incident Based Reporting System (KIBRS).

## IX. ADMINISTRATIVE LEAVE FROM DUTY ASSIGNMENT (4.2.3)

A. When an officer's actions or response to resistance techniques result in death or serious physical injury, the officer shall be removed from their operational assignment pending an administrative review. The Superintendent may elect to do any or all of the following:
   1. Require the officer to undergo a mental health evaluation and/or attend a mental health debriefing with an agency appointed mental health professional;
   2. Place the officer on administrative leave;
   3. Temporarily reassign the officer.
B. If an officer is placed on administrative leave and required to complete a mental health evaluation and/or debriefing; the officer shall remain on leave until it is determined by a mental health professional that the officer is ready to return to duty and/or when directed to return to duty by the Superintendent.
C. Upon return to duty, the officer may be assigned to administrative duties for a period of time deemed appropriate by the Superintendent based upon information from the officer or a mental health professional.
D. Administrative leave shall not be interpreted to imply or indicate that the officer acted improperly.
E. While on administrative leave, the officer shall remain available for official agency interviews regarding the incident. The officer shall not discuss the incident with anyone except appropriate agency personnel investigating the incident, the Attorney General's office, a mental health professional, any member of the agency PEER Team as described in PER-28 with confidential privilege

provided by K.S.A. 60-473, the officer's attorney, the officer's clergy, and/or the officer's immediate family.

## X. LEGAL DISCLAIMER

A. This policy is for agency use only and does not apply in any criminal or civil proceeding. The agency policy should not be construed as a creation of higher legal standard of safety or care in an evidentiary sense with respect to third party claims. Violations of this policy will only form the basis for agency administrative sanctions.

## XI. ANNUAL ANALYSIS

A. The Professional Standards Unit will annually conduct an analysis of agency use of force activities, policies, and practices.
   1. Agency field operations, specialty units, training center, and civilian sections may be requested to participate in the analysis as necessary. (4.2.4)
   2. The analysis shall identify:
      a. Date and time of incidents;
      b. Types of encounters resulting in the use of force;
      c. Trends or patterns related to race, age and gender of subjects involved;
      d. Trends or patterns resulting in injury to any person including employees; and
      e. Impact of findings on policies, practices, equipment, and training.

EXHIBIT 14

| | SUBJECT | POLICY NUMBER |
|---|---|---|
| | **PURSUITS** | **OPS-16** |
| | | EFFECTIVE DATE |
| | | **06/06/25** |
| | APPLICABLE CALEA STANDARDS | RESCINDS |
| | **41.2.1, 41.2.2** | **OPS-16** |
| | | DATE |
| | | **05/16/25** |

## I. PURPOSE

To establish guidelines for making decisions with regard to vehicular pursuit.

## II. POLICY

Vehicular pursuit of fleeing suspects can present a danger to the lives of the public, officers, and suspects involved in the pursuit. It is the responsibility of the agency to assist officers in the safe performance of their duties. To fulfill this obligation, it must be the policy of the Kansas Highway Patrol to regulate the manner in which vehicular pursuits are undertaken and performed.

## III. DEFINITIONS

A. **Vehicular Pursuit -** An active attempt by an officer in an authorized emergency and manufactured police-rated vehicle to apprehend a fleeing suspect who is actively attempting to elude the officer.

B. **Authorized Emergency Vehicle -** A vehicle of this agency equipped with operable emergency equipment as designated by state law.

C. **Primary Unit -** The patrol unit which initiates a pursuit or any unit which assumes control of the pursuit.

D. **Secondary Unit -** The patrol unit which becomes involved as an immediate backup to the primary unit and follows the primary unit at a safe distance.

E. **Tertiary Unit -** The patrol unit used as the cover vehicle after the application of the TVI, on a high-risk traffic stop.

F. **Legal Intervention -** A deliberate or intentional contact of a suspect's vehicle with an agency vehicle to functionally damage or otherwise force the suspect's vehicle to stop.

G. **Tactical Vehicle Intervention or (TVI) -** TVI is a technique by which a police vehicle pursuing or wishing to disrupt the current path of travel of another vehicle does so with minimal vehicle contact. TVI maneuver is designed to predictably and safely terminate a pursuit or any other Patrol situation requiring vehicle intervention.

H. **The Grappler –** A push bumper style "vehicle arresting" device that deploys a webbing around the rear wheel of a suspect vehicle, resulting in the tire seizing. The webbing remains attached to the patrol vehicle via a tether and stops the suspect vehicle as the patrol vehicle brakes. The Grappler requires advanced technical training prior to use.

## IV. GENERAL PROVISIONS

A. No unmarked vehicle must be used for pursuit driving unless such vehicle is equipped with and utilizing emergency lights and siren. (41.2.2 e)

   1. Should an emergency need dictate use of an unmarked vehicle, that vehicle must be replaced in the pursuit by a marked vehicle as soon as possible.

2. Patrol cars utilizing "ghost" graphics or subdued markings will be considered a marked unit. However, operators of these vehicles should be aware of people that are cautious in determining whether to stop for such a vehicle. Therefore, operators should be mindful in how they handle such encounters.

B. The use of agency motorcycles is authorized to conduct a pursuit. However, the agency motorcycle unit should be replaced by a marked vehicle as soon as possible.

C. The use of non-police or non-pursuit rated vehicles to conduct a pursuit is prohibited.

D. Use of off-duty personal vehicles to conduct a pursuit is prohibited.

E. A pursuit must not be initiated when non-law enforcement personnel are being transported.

## V. PROCEDURES

A. Initiation of pursuit: (41.2.2 b, c)

1. Officers are expected to make a diligent and reasonable effort to stop suspected or actual violators based upon their discretion. The decision to initiate or continue a pursuit must be based on the pursuing officer's conclusion that the immediate danger to the officer and the public created by the pursuit is less than the immediate or potential danger to the public should the suspect remain at large.
2. Any law enforcement officer, in an authorized emergency and manufactured police rated vehicle, may initiate a vehicular pursuit when the suspect exhibits the intention to avoid apprehension by refusing to stop when properly directed to do so. Pursuit may also be justified by a reasonable belief that the suspect, if allowed to flee, would present a danger to human life or cause serious injury.
3. In deciding whether to initiate or continue a pursuit, the officer must evaluate and take into consideration the totality of the circumstances surrounding the incident. Including but not limited to: (41.2.2 a)
   a. The nature and seriousness of violation;
   b. Road, weather, and environmental conditions;
   c. Population density and presence of vehicular/pedestrian traffic;
   d. The officer's familiarity with area;
   e. Patrol vehicle condition;
   f. Any alternative methods of apprehension;
   g. Likelihood of successful apprehension;
   h. Mutual aid agreements with city and county authorities;
   i. Aircraft availability and operational engagement during the pursuit.

B. Pursuit operations:

1. All emergency vehicle operations must be conducted with due regard for the safety of the officer(s) and the public.
2. Officers involved in "pursuit" driving must immediately and continuously activate their emergency equipment to give both audible and visual warning.
3. Upon engaging in pursuit, the officer must notify the communications center of the location, direction and speed of the pursuit, the description of the pursued vehicle and the initial purpose of the stop. The officer must keep communications updated on the pursuit except when a secondary officer is available to assume communication responsibility. (41.2.2 b, c)
   a. Communications center personnel must notify any available supervisor in the Troop of the pursuit, clear the radio channel of non-emergency traffic and relay necessary information to other officers and jurisdictions.
   b. Communications center must broadcast periodic updates regarding pursuit status in order to keep other officers informed.

c. Communications center must notify nearest aircraft crew of pursuit and all available information. The decision to provide air assistance must be coordinated between the aircraft crew and pursuing units and/or on-duty supervisor. (41.2.2 f)

d. If the aircraft unit has established surveillance over the pursuit and the suspect vehicle comes to a stop, the aircraft unit will coordinate with the ground units to apprehend the suspect(s).

4. A pursuit originating when the only known violation(s) involves a traffic violation(s) must consist of no more than three KHP units, a primary, a secondary and a tertiary unit.

a. Additional KHP units may actively join the pursuit based on the severity of the crime (felony /misdemeanor) causing the pursuit to be initiated, as well as additional criminal factors observed or that become known during the pursuit. Those additional KHP units must consider the total number of pursuit participants and the need and effectiveness of their addition to the pursuit, when deciding to actively join the pursuit. A Patrol supervisor may limit the number of pursuit participants at any time.

b. Active pursuit vehicles must maintain visual contact with violator's vehicle if possible and be prepared to apprehend violator when vehicle stops.

c. All other vehicles must stay clear of pursuit but remain alert to the progress and location. This does not preclude an officer from routinely moving toward the area in the event the pursuit alters course.

d. Aircraft must only be used as a surveillance unit and must continuously advise of violator's location and approximate speed. If possible, a video of the pursuit must be made from the aircraft. (41.2.2 e)

C. Supervisory responsibilities: (41.2.2 g) (41.2.3 a)

1. When made aware of a vehicular pursuit, the appropriate supervisor must monitor incoming information, coordinate and direct activities as needed to ensure that proper procedures are used.

2. When possible, the supervisor must respond to the location where a vehicle has been stopped following the pursuit.

D. Authorized Pursuit tactics:

1. Stop Sticks:

a. Officers may elect to deploy hollow spike tire deflation strips, hereinafter referred to as Stop Sticks, to terminate a pursuit. Whenever possible, a supervisor's permission should be obtained prior to deploying Stop Sticks. (41.2.3 a, d)

b. All sworn personnel must be trained on the use of Stop Sticks and at no time should an untrained officer deploy Stop Sticks (41.2.3 c)

c. Stop Sticks must not be used to stop vehicles with less than four wheels (motorcycles, mopeds, etc.).

d. The Stop Sticks must not be used in locations where geographic configurations increase the risk of injury to the suspect, e.g., on roadways bounded by steep descending embankments, curves or at locations where the safety of proceeding or opposing traffic cannot be assured.

e. The following guidelines must apply when deploying Stop Sticks: (41.2.3 b)

1) Pursuing units should notify the Stop Stick deploying unit as far in advance as possible.

2) The officer with the Stop Sticks should not attempt to overtake and pass a high-speed pursuit in order to deploy the Stop Sticks.

3) Deployment locations should have reasonably good sight distances to enable the officer to deploy the Stop Sticks to observe the pursuit and other traffic as it approaches.

4) For optimum performance, Stop Sticks should be deployed on paved surfaces such as concrete or blacktop.

5) The officer deploying the Stop Sticks should use substantial cover such as a guardrail, bridge pillar, or other object of sufficient structure capable of stopping an approaching vehicle. Per the manufacturer, patrol vehicles are not considered adequate cover.
6) To prevent damage to Patrol vehicles, ensure the position of the Stop Stick upon deployment is such that the pursued vehicle passes the officer's parked Patrol vehicle prior to passing over the Stop Stick.
7) After the Stop Stick is in position, the officer should hold onto the cord reel to ensure quick removal from the roadway without danger to himself/herself. As a safety precaution, care should be taken to ensure that the cord is not wrapped around clothing, fingers, hands, etc.
8) Extreme care should be exercised when deploying the Stop Stick to reduce the possibility of damage to uninvolved vehicles and pedestrians. After deploying, officers should immediately seek cover as the Stop Stick and cord may become airborne upon impact.
9) Connected or disconnected Stop Sticks may be tossed into the path of a pursued vehicle.

f. Follow the manufacturer's recommendations when assembling, retrieving, and storing Stop Sticks.

g. Reporting Requirements
1) Officers who deploy Stop Sticks must complete and submit an Incident Narrative Report (HP-133) in workflow, within 48 hours of the incident, detailing the use of Stop Sticks.

h. Supervisory Responsibilities (41.2.3 d)
1) The immediate supervisor of officer who deploys Stop Sticks must review the Incident Narrative Report (HP-133) within 7 days of the incident, through the normal workflow process.

2. Tactical Vehicle Intervention:

a. Officers should attempt to obtain supervisory approval before employing the TVI maneuver. At any time, a supervisor may request other methods to be utilized before the use of TVI.

b. At no time must an officer execute or attempt to execute a TVI maneuver unless they have been properly trained and certified to perform the maneuver. (41.2.3 c)

c. Anytime a TVI maneuver is used, officers should ensure they have proper back-up for the high-risk traffic stop that may follow. Only in extreme situations should an officer perform the maneuver without backup.

d. It is imperative that officers consider the traffic and roadway conditions, as well as the speed of the pursued vehicle prior to performing the maneuver. When determining the speed at which an officer should utilize the TVI maneuver, the following list of non-exclusive factors should be considered: (41.2.3 a, b)
1) Nature and seriousness of the violation, offense or crime being committed or investigated.
2) Whether the violator is showing disregard for public safety.
3) Whether the violator is showing obedience to traffic control devices, i.e. stop and yield signs, traffic signals at controlled intersections, pedestrian crosswalks or announcements of populated areas or public gatherings.
4) Whether the violator is swerving at other vehicles in an attempt to cause vehicle crashes that would cause bodily harm to bystanders and other officers or impede the pursuit.
5) Whether the violator is driving on the wrong side of the road and into oncoming traffic.
6) Whether the violator is causing other motorists to drive off of the roadway.

e. When deciding whether to use the TVI procedure, the officer should consider the totality of the circumstances including but not limited to the following factors: (41.2.3 a)
1) Roadway conditions: wet or dry, width, divider or other median obstructions, roadside obstructions (trees, overpass pillars, buildings, ditches, etc.), curves, etc.;

2) Weather conditions: fog, snow, rain, etc.;
3) Visibility: sight distance, lighting, etc.;
4) Traffic volume;
5) Pedestrian Traffic
6) Type of fleeing vehicle
7) Occupants: number of occupants, where occupants are located in the vehicle
8) Vehicle damage: pre-existing damage to the violator's vehicle (mainly damage to the rear of vehicle, missing rear bumper, etc.), flat tires, etc.
9) Whether there are juveniles present in the violator's vehicle
10) Whether the patrol vehicle has TVI/push bumpers affixed to the vehicle.
    (a) Patrol vehicles without TVI/push bumpers should only be used to perform a TVI when exigent circumstances are present, such as the need to immediately end a pursuit that has a higher degree of danger to the motoring public (e.g., a wrong-way driver, suspected impairment with the inability to operate a motor vehicle, or person felony charges).

f. TVI should not be used to stop the following vehicles:
   1) Any passenger bus type vehicles
   2) Any vehicle operated by a known minor and/or juvenile unless there is probable cause to believe that the minor and/or juvenile has committed a violent felony
   3) Pick-up trucks with passengers in the cargo area
   4) Larger mass vehicles
   5) Vehicles with less than 4 wheels (motorcycles, Spyders, etc.)
   6) All-terrain vehicle

g. Officers must consider all the factors above, their experience and abilities, and the danger of allowing the violator to continue down the roadway prior to each attempt to TVI the violator's vehicle.

h. TVI Reporting Requirements
   1) Officers who execute the TVI maneuver must complete and submit a Response to Resistance Report (HP-132/FOR-16) and applicable paperwork in workflow, within 48 hours of the incident. (41.2.3 e)

i. Supervisory Responsibilities (41.2.3 d, e)
   1) The review and reporting requirements outlined in ENF-04 (Response to Resistance) must be followed by the first and second level supervisors of the officer.

3. The Grappler:
   a. Only officers trained in the use of The Grappler may deploy the device.
   b. The use of The Grappler will be in accordance with the training considerations and conditions present at the time, including the risk of injury to the public, the officers, and the occupants of the pursued vehicle.
   c. The use of The Grappler is not authorized for the following vehicles, except in incidents where deadly force is authorized:
      1) Vehicles designed from the factory with less than four wheels,
      2) Trucks with dual rear wheels, or
      3) Vehicles identified as carrying hazardous materials.
      4) Vehicles pulling a trailer
      5) Larger mass vehicles
   d. Before deploying The Grappler, numerous factors should be considered including, but not limited to:
      1) Weather and road conditions
      2) Suspect's vehicle driving behavior and speed

3) Suspect's vehicle tire inflation
4) Traffic conditions
5) Location
6) Pedestrian Traffic

e. Officers must consider all the factors above, their experience and abilities, and the danger of allowing the violator to continue down the roadway prior to attempting to use The Grappler.

f. When feasible, The Grappler should be deployed only after the deploying officer gives notification of intent and location to other officers.

g. Anytime The Grappler is used, officers should ensure they have proper back-up for the high-risk traffic stop that may follow. Only in extreme situations should an officer perform the maneuver without backup.

h. All vehicles successfully seized through use of The Grappler must be towed from the scene in accordance with the agency Vehicle Tow/Inventory policy (OPS-07).
   1) Prior to releasing the vehicle to the towing company, the deploying officer must affix The Grappler manufacturer-provided warning sticker in a conspicuous place inside the vehicle.

i. The Grappler Reporting Requirements
   1) Officers who utilize The Grappler must complete and submit a Response to Resistance Report (HP-132/FOR-16) and applicable paperwork in workflow, within 48 hours of the incident.

j. Supervisory Responsibilities
   1) The review and reporting requirements outlined in ENF-04 (Response to Resistance) must be followed by the first and second level supervisors of the officer.

k. The Grappler Inspection and Maintenance
   1) Officers who are assigned a vehicle with The Grappler will conduct periodic inspections of the device. The inspections will be completed no less than annually. Operators will document the inspection of the device on the… and forwarded to Fleet.

4. Use of roadblocks must be directly associated with the seriousness of the crime for which the violator is being pursued. For the use of roadblocks refer to OPS-15 (Roadblocks).

5. Decisions to discharge firearms at or from a moving vehicle and utilizing legal intervention may constitute deadly force and must be governed by ENF-04 (Response to Resistance) and are prohibited if they present an unreasonable risk to others. If at all possible, the officer should get prior approval to perform these actions.
   a. All firearm discharges, whether by a pursuing officer or a violator, must be reported to the communications center and to all other pursuing vehicles as soon as possible. The reporting officer must clearly identify source of firearm discharge, if known.

E. Termination of the pursuit: (41.2.2 a, b, g, h)

1. The primary pursuing unit must continually re-evaluate and assess the pursuit situation including all of the initiating factors and terminate the pursuit whenever he or she reasonably believes the risks associated with continued pursuit are greater than the public safety benefit of making an immediate apprehension.

2. The pursuit may be terminated at any time by the primary pursuit unit or a supervisor. (41.2.2 i)
   a. A pursuit may also be terminated upon the recommendation of any KHP officer, regardless of rank, when they can articulate the same circumstances outlined in E.1., E.3., or E.4. of this section.
   b. No officer or supervisor must be criticized or disciplined for making the decision, based on the law and/or this policy, not to pursue or the decision to abandon the pursuit.

3. A pursuit may be terminated if the suspect's identity has been determined, immediate apprehension is not necessary to protect the public or officers, and apprehension at a later time is feasible.
4. A pursuit must be terminated when:
   a. There is equipment failure involving an emergency signal device, radio, brakes, steering or other failure that affects the safe operation of the pursuit vehicle.
   b. The pursuing officer knows or is reasonably certain the fleeing vehicle is operated by a juvenile and offense constitutes a misdemeanor or a non-serious felony.

## VI. INTER-JUSRISDICTIONAL PURSUITS (41.2.2 j)

A. Patrol officers must only pursue into bordering states when in fresh pursuit of known/suspected violent felony suspect(s).
   1. A violent felony is any felony in which the suspect has used, threatened, or attempted to use force toward any person which could cause serious physical injury or death. It includes, but is not limited to murder, kidnap, rape, and aggravated assault/battery.

B. Officers are prohibited from continuing a pursuit into a foreign jurisdiction without notifying the communications center.
   1. An officer should receive authorization from a supervisor to proceed into a foreign jurisdiction unless the delay in seeking such authorization would jeopardize pursuit effectiveness.
   2. The primary unit must, upon entering a foreign jurisdiction without a supervisor's authority, contact a supervisor as soon as practicable for authorization to continue pursuit.

C. Upon authorizing an officer to pursue a violator into a foreign jurisdiction, the supervisor must inform foreign jurisdiction, if possible, through the communications center of the following information:
   1. Pursuit has or is about to enter their jurisdiction;
   2. Name of pursuing agency, including number and identity of vehicles;
   3. Location and direction of travel of pursuit;
   4. A complete description of the violator's vehicle and occupants, including criminal history information if available;
   5. Description of the crime the violator is believed to have committed;
   6. The type of assistance requested, if any.

D. When entering a foreign jurisdiction, officers must re-evaluate the pursuit and consider the following factors:
   1. Legality of entering foreign jurisdiction;
   2. Personal knowledge of terrain, traffic, and street geography in foreign jurisdiction;
   3. How long pursuit has lasted;
   4. Need for foreign jurisdiction assistance;
   5. Communications in and with foreign jurisdiction.

E. Primary unit or a supervisor should request foreign jurisdiction to take over the pursuit as soon as it is practical to do so for tactical reasons. Assistance will not be requested from a foreign jurisdiction if our agency has terminated pursuit.
   1. Officers must not request an officer from a foreign jurisdiction to actively join in pursuit if Patrol primary and secondary vehicles are both still actively involved in pursuit; however, other forms of assistance may be requested. If an officer from foreign jurisdiction actively joins pursuit, one Patrol vehicle should terminate active pursuit. (41.2.2 h)

## VII. FORT RILEY AREA PURSUITS

A. When a violator is fleeing toward Fort Riley, the primary unit should notify the communications center of location, description of vehicle, speed, direction of travel and reason for pursuit.

B. Fort Riley Military Police will be contacted by dispatch.
C. Primary unit will maintain radio contact with communication center and advise changes in direction of travel and violator's location.
D. Fort Riley is a secure military reservation and access to the post is controlled. Patrol units must discontinue pursuit prior to the security gate. Security forces may use deadly force, including roadblocks, to prevent vehicles from entering the military reservation.
E. Fort Riley Military Police will make every effort to apprehend the violator. Providing the vehicle is stopped on the military reservation, military police will take violator into custody and wait for the arrival of pursuing officers.
F. An officer may take one of two actions:
   1. Issue the violator an NTA, or
   2. If violator consents and the military authorities will release the violator, escort them off post to appear before a civilian magistrate.
G. In the event it is necessary to issue a warrant, every effort will be made by the military police to make the violator available.
H. It is conceivable situations could arise involving manslaughter compounded by leaving the scene of an accident. In such cases, it is possible for the military police to hold the offender for questioning until the legal process can be served.

## VIII. PURSUITS ENTERING OR EXITING TURNPIKE

A. When a pursuit originates on the turnpike and exits the turnpike, a local Troop supervisor will assume responsibility for coordinating pursuit.
B. When a pursuit originating off the turnpike continues onto the turnpike, a turnpike supervisor will assume responsibility for coordinating pursuit.
C. When a pursuit is initiated by officers who are outside their normally assigned district, the primary vehicle may, at the discretion of supervisor coordinating pursuit, be replaced by a local district officer.

## IX. OTHER AGENCY INITIATED PURSUITS

A. Prior to becoming involved in another agency's pursuit, officers should attempt to obtain supervisory approval.
B. Officers will not become involved in another agency's pursuit, unless requested to do so by that agency and it reasonably appears to meet the criteria established by this policy. Officers may consider a request for assistance as implied if circumstances indicate an officer from another agency may be in jeopardy if assistance is not provided (e.g. a single officer pursuing a vehicle containing multiple occupants). When circumstances warrant, the officer should withdraw from the pursuit unless specifically requested by the other jurisdiction to continue.
C. Officers are prohibited from participating or providing assistance to other agencies for the purpose of conducting roadblocks unless authorized to do so by a supervisor. A supervisor should not authorize such stopping methods unless the use of such methods is acknowledged by the initiating jurisdiction.

## X. OFFICER/SUPERVISOR RESPONSIBILITIES AFTER PURSUIT

A. Officer(s):
   1. Officers should be aware that they may experience an "adrenaline dump" at the conclusion of a pursuit. Consequently, if possible, it is recommended that a backup officer(s) take responsibility for handcuffing the suspect(s). (41.2.2 c)
   2. Any officer who assumes a primary role in any pursuit must, upon conclusion of the incident, complete and submit a Vehicle Pursuit Report (HP-261) and an Incident Narrative Report (HP-133)

in workflow, within 48 hours of the incident (41.2.2 k). More than one Vehicle Pursuit Report (HP-261) can be submitted under one case number in incidents where there was more than one primary pursuit officer.

   a. All other responding officers involved in a pursuit will complete and submit an Incident Narrative Report (HP-133) in workflow, within 48 hours of the incident.

3. When any tactical vehicle intervention maneuver is used, a Response to Resistance (HP-132) form must be completed and submitted in workflow along with the case report, by the officer who performed the maneuver.

B. Supervisor: (41.2.2 g, k) (41.2.3 d)

1. A Troop supervisor must determine if a traffic accident occurred during pursuit at any point along pursuit route. This provision applies to any traffic accident involving a patrol vehicle, the vehicle pursued or any other vehicles or property. If an accident occurs, the troop supervisor will notify the communications center and cause an investigation to be conducted.
2. Should an officer's response to resistance result in a fatality at any time during or after pursuit, the troop supervisor will notify regional commander of the fact and must cause a preliminary investigation to be conducted in accordance with ENF-04 (Response to Resistance).
3. The primary pursuit officer's first level Supervisor must evaluate procedures used during the pursuit, review all applicable reports (see Vehicle Pursuit Report, HP-261) and should indicate whether policy, training, equipment, or corrective action/disciplinary issues should be addressed. The second level supervisor will review the immediate supervisor's review and recommendations documented on the Vehicle Pursuit Report, recordings, and applicable reports. The commander's recommendations will be documented on the Vehicle Pursuit Report (HP-261).
4. Troop Commanders are responsible for ensuring all policy, training, equipment, and corrective action/disciplinary issues are properly addressed and documented.
   a. Vehicle Pursuit Reports must be submitted to the Records Section and Professional Standards Unit within 15 days of the incident date.

## XI. ANNUAL ANALYSIS & REVIEW

A. The Professional Standards Unit or the Colonel's designee will conduct a documented annual analysis of agency pursuits, policies, and practices to reveal possible patterns or trends that may indicate training needs, equipment upgrades, and/or policy modification. Agency field operations, specialty units, training center and civilian sections may be requested to participate in the analysis as necessary. (41.2.3 e) (41.2.2 k)

B. The Annual Analysis and Review of Pursuit Policies and Reporting Procedures will be submitted to and approved by the Superintendent. (41.2.2 i)

## XII. TRAINING (41.2.3 c)

A. Documented initial training on the pursuit policy is conducted at KHPTA. (41.2.2 m)

B. In-service training requirements will consist of biennial training either in the classroom or practical training. This training will address the use of EVOC, roadblocks, Tactical Vehicle Intervention, stop sticks, and other techniques and areas of concern identified by Command Staff as problem areas. These areas will be determined by review of vehicle collision and vehicle reports.

C. A documented annual review of the pursuit policy in PowerDMS is required of all sworn personnel. (41.2.2 n)