# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

DA'JHON AMARIA BOSTIC,      )
      )
      Plaintiff,      )
      )
v.      )      Case No. 25-3056-JWB-RES
      )
(FNU) GARCIA and (FNU) WOOD,      )
      )
      Defendants.      )
      )

## DEFENDANTS' JOINT MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT

Defendants Master Trooper Garcia and Officer Wood ("Defendants")[1] respectfully request that this Court dismiss the claims against them under Fed. R. Civ. P. 12(b)(1) and (b)(6) or grant summary judgment in their favor under Fed. R. Civ. P. 56. Defendants attach seven new exhibits, and state the following in support.

### INDEX OF EXHIBITS[2]

| Exhibit | Description |
|---------|-------------|
| A | Missouri Department of Corrections (MDOC) Offender Search Report |
| B | Selected Court Records from Jackson County, Missouri, District Court cases nos. 2316-CR03624 and 2316-CR03624-01 |
| C | Selected Court Records from Jackson County, Missouri, District Court cases nos. 2316-CR03767 and 2316-CR03767-01 |
| D | Selected Court Records from Jackson County, Missouri, District Court case no. 2416-CR01555-01 |
| E | Declaration of Master Trooper Prestan Garcia |

---

[1] Defendant Garcia is represented by Assistant Kansas Attorneys General Matthew L. Shoger and Scott G. Nading. Defendant Wood is represented by Assistant Missouri Attorney General Adam J. Merello.

[2] The court can take judicial notice of the custody location for Bostic in the MDOC Offender Search Report contained in Exhibit A. *United States v. Basher*, 629 F.3d 1161, 1165 & n.2 (9th Cir. 2011) (citing *Demis v. Sniezek*, 558 F.3d 508, 513 n.2 (6th Cir. 2009) and *United States v. Montgomery*, 550 F.3d 1229, 1231 n.1 (10th Cir. 2008)). The Court can also take judicial notice of the court records in Exhibits B through D. *Gee v. Pacheco*, 627 F.3d 1178, 1186, 1191 (10th Cir. 2010).

| F | Declaration of Trooper Sam Irwin |
| G | Declaration of Lieutenant Gustavo Ramirez |

**NATURE OF THE CASE**

Plaintiff Da'Jhon Amaria Bostic alleges that on February 10, 2024, he was tased by Defendant Garcia, Defendant Wood ripped the taser prongs out of his chest and stomach, and that these officers lost his cell phone while arresting him. (Doc. 31 at 2-3, 6.)

Bostic filed this lawsuit on March 27, 2025. (Doc. 1.) Bostic filed his Second Amended Complaint ("Complaint") on February 12, 2026. (Doc. 31.) In that Complaint, Bostic swapped out or dropped earlier defendants in the case, leaving only Defendants Garcia and Wood. (*See* Doc. 32 at 4; Doc. 31 at 1-2; Doc. 30 at 1-2; Doc. 7 at 6; Doc. 5 at 1; Doc. 1 at 1, 5.) Bostic brings claims for excessive force (citing the Eighth and Fourth Amendments) and for loss of his cell phone (citing the Eighth, Fourth, and Fourteenth Amendments). (Doc. 31 at 1-3, 6.) Bostic sues the defendants in their individual and official capacities. (Doc. 31 at 13, 9.) Bostic seeks: nominal damages; compensatory damages for "damages to [his] body," "reimbursement of [his] iphone," and "emotional distress"; and punitive damages. (Doc. 31 at 8.)

On February 13, 2026, the Court finished screening Bostic's Complaint under the Prison Litigation Reform Act (PLRA). (Doc. 32 at 5.) The Court dismissed Bostic's claims based on the loss of his cell phone. (Doc. 32 at 5; *see also* Doc. 22 at 6-8.) Only Bostic's excessive force claims survived screening. (Doc. 32 at 5.) This case involves the use of force during an arrest, so the Court found the excessive force claims were properly characterized as being brought under the Fourth Amendment (rather than the Eighth Amendment). (Doc. 22 at 4 (citing *Vette v. Sanders*, 989 F.3d 1154, 1169 (10th Cir. 2021)).) In summary, all that remains after screening are Bostic's Fourth-Amendment excessive-force claims against Defendants Garcia and Wood.

2

As the Court has already discussed, the video evidence in this case shows that:

> Plaintiff has not stated a plausible claim for excessive force. Considering the reasonableness factors outlined in *Vette*, Plaintiff was driving a stolen vehicle, he led LEOs on a high-speed chase, he posed a threat to the safety of others by repeatedly swerving into oncoming lanes of traffic and driving the wrong way on an off ramp from I-70 with the headlights out, he refused to stop and had to be rammed by a police vehicle to forcibly stop his vehicle, he immediately got out of the vehicle and took off running, he was pursued and ordered to stop, and he did not stop and surrender. Plaintiff appears to be actively attempting to flee at the precise moment the officers employed the challenged use of force, and the force ceased once his resistance ceased. While Plaintiff may have made the decision to surrender, his actions did not reflect that decision at the time he was tased.

> As for the removal of the taser prongs, the video shows Plaintiff asking to have the prongs removed and an officer responding to his request. The video does not show officers yanking out the prongs. The video also shows that EMS was at the scene and briefly looked at Plaintiff's torso.

(Doc. 22 at 5-6; *see also* Doc. 32 at 3 (similar).) For purposes of screening, the Court was "unable to resolve the factual disputes" because "the Court 'cannot resolve material disputed factual issues by accepting the report's factual findings when they are in conflict with pleadings or affidavits'" (Doc. 32 at 5 (quoting *Hall v. Bellmon*, 935 F.2d 1106, 1109 (10th Cir. 1991)).)

Bostic's official-capacity claims against Defendants should be dismissed for lack of subject-matter jurisdiction due to Eleventh-Amendment immunity. If any claims under the Eighth Amendment remain, they should be dismissed for failure to state a claim because the proper excessive-force test to apply in this case arises under the Fourth Amendment only. Bostic's individual-capacity claims should be dismissed for failure to state a claim in light of qualified immunity based on the video evidence incorporated by reference or otherwise adopted in the Complaint. Alternatively, Defendants are entitled to summary judgment in light of qualified immunity based on the evidentiary record, which includes the video evidence. Lastly, if any claims survive this motion, partial summary judgment should be granted with regard to claims for punitive damages due to lack of the requisite subjective intent.

3

**STATEMENT OF MATERIAL FACTS AS TO WHICH
NO GENUINE ISSUE EXISTS**

### *House Arrest*

1. Beginning in September 2023, Plaintiff Da'Jhon Amaria Bostic was placed under house arrest in Jackson County, Missouri. (Exhibit B at 2-3, 15.)

2. In October 2023, Bostic was again placed under house arrest in Jackson County, Missouri, under different conditions than before. (Exhibit B at 5, 17-18; Exhibit C at 2-3, 12.)

3. Bostic remained subject to house arrest on February 10, 2024. (*See* Exhibit B at 1-13 (docket), 20-21 (showing that the docket entry "Bond-Released on Own Recog" means Bostic was released into house arrest, rather than from it); Exhibit C at 1-11 (docket), 13 (released to house arrest); Doc. 21 (Exhibit 4 at 22:11, 26:34, 28:40, 28:44, Exhibit 6 at 20:38, and Exhibit 7 at 20:43) (Bostic can be heard saying "I'm on house arrest.").)[3]

### *Car Chase*

4. At around 10:55pm on February 10, 2024, the Kansas City, MO Police Department ("KCPD") announced on a mutual aid radio channel that KCPD was pursuing a vehicle for Aggravated Assault of a law enforcement officer. (Doc. 18-1 at 1; *see also* Exhibit E at ¶ 2; Doc.

---

[3] Exhibits 4 through 7 to the *Martinez* Report comprise relevant body-worn camera (BWC) footage. Bostic incorporated BWC footage by reference or otherwise adopted it in his Complaint, and that footage is central to his claims. (Doc. 31 at 11-12, 14); *see also Estate of Ronquillo ex rel. Estate of Sanchez v. City & Cnty. of Denver*, 720 F. App'x 434, 437 (10th Cir. 2017) (considering, on a motion to dismiss, video exhibits attached to the complaint); *Varnas v. Thompson*, No. 24-2193-JAR, 2024 WL 4625536, at *2 (D. Kan. Oct. 30, 2024) (considering BWC videos on a motion to dismiss "as the videos are referenced in the Complaint and contain information central to Plaintiff's claims"); *Gee v. Pacheco*, 627 F.3d 1178, 1186 (10th Cir. 2010) (allowing consideration under Fed. R. Civ. P. 12(b)(6) of material that a complaint incorporates by reference or references when it is central to the claims). *Contrast with Fuqua v. Santa Fe Cnty. Sheriff's Off.*, 157 F.4th 1288, 1298 (10th Cir. 2025) (not considering videos on a motion to dismiss when not attached, incorporated into, or referenced by the complaint). The footage can also be considered under Rule 56. *Hartz v. Sale*, 687 F. App'x 783, 785 (10th Cir. 2017) ("[T]he Martinez report is part of the summary judgment record and, absent valid challenge, may be treated as providing uncontroverted facts.").

31 at 10 ("officers . . . were in pursuit on . . . a suspect of Attempted Aggravated Assault on a Law Enforcement Officer"); Doc. 21 (Exhibits 4, 6, and 7) (BWC footage including detailed verbal descriptions of the vehicle pursuit as it occurs).)

5. The vehicle being pursued was a black Kia Sorento that had been reported as stolen. (Doc. 18-1 at 1-3; *see also* Exhibit F at ¶ 2; Doc. 31 at 10 ("officers . . . were in pursuit on a Kia that was reported stolen").)

6. The driver of the vehicle was later identified as Bostic. (Doc. 18-1 at 1; *see also* Doc. 31 at 10.)

7. Bostic resisted a lawful stop by fleeing from law enforcement officers, and fled in such a manner that created a substantial risk of serious physical injury or death to other persons. He drove at speeds exceeding 120 miles per hour, weaved in and out of traffic, and drove against the flow of traffic. This conduct constituted a felony. (Exhibit D at 11, 14-17.)[4]

---

[4] Issue preclusion (or collateral estoppel) applies to establish the facts in this paragraph and the next paragraph. Under the Full Faith and Credit act, "[f]ederal courts must give to state court judgments 'the same full faith and credit ... as they have by law or usage in the courts of such State, Territory or Possession from which they are taken.'" *Pohl v. U.S. Bank*, 859 F.3d 1226, 1229 (10th Cir. 2017) (alteration in original) (quoting 28 U.S.C. § 1738); *see also Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 293 (2005). Missouri courts hold that issue preclusion applies based on a plaintiff's plea of guilty in an earlier criminal case in favor of a defendant in a later civil case "even though the party asserting collateral estoppel was not a party to the prior case." *James v. Paul*, 49 S.W.3d 678, 682-88 (Mo. 2001) (en banc); *see also Thompson v. Platt*, 815 F. App'x 227, 234 (10th Cir. 2020) (holding that issue preclusion applies "in a civil case to preclude relitigation of an issue decided in favor of the prosecuting authority in a prior criminal case"). In other words, when the guilty plea and resulting judgment have proven a fact beyond a reasonable doubt (the higher standard) in a criminal case, that precludes an attempt to disprove that fact by a preponderance of the evidence (the lower standard) in a civil case. Because the higher standard has already been met, the lower standard has already been met and even surpassed. *See* 18B Wright & Miller's Federal Practice and Procedure § 4474 & n.12 (3d ed. April 2026 update) (citing *United States v. Egan Marine Corp.*, 843 F.3d 674, 678-79 (7th Cir. 2016)) (saying, conversely, that the failure to prove a fact under the lower standard of a preponderance of the evidence can later preclude an attempt to prove the same fact under the higher standard of beyond a reasonable doubt). And Missouri allows defensive use of issue preclusion without mutuality of parties. *See James*, 49 S.W.2d at 685-88.

8. Bostic knowingly possessed the Kia automobile without the consent of the owner. This conduct constituted a felony: tampering with a motor vehicle in the first degree. (Exhibit D at 10, 14-17.)

9. Bostic repeatedly drove in oncoming lanes of traffic. (Exhibit D at 11, 14-17; Doc. 21 (Exhibit 2 at 10:11, Exhibit 4 at 00:12, 14:39, 20:17, Exhibit 6 13:02, 18:44, Exhibit 7 at 13:09, 18:51, Exhibit 9 at 16:15); Doc. 18-1 at 1-3.)

10. In pursuit of the vehicle, Master Trooper Garcia of the Kansas Highway Patrol ("KHP") observed the vehicle swerve to avoid Stop Sticks placed by KHP Lieutenant Ramirez and cross into oncoming lanes of traffic. (Doc. 18-1 at 1; Doc. 21 (Exhibit 9 at 16:15).)

11. During the pursuit, KHP Trooper Irwin was exiting toward Kaw Drive from eastbound I-70 and saw the Kia driving the wrong way down the street with its headlights deactivated. (Doc. 18-1 at 1, 3; Doc. 21 (Exhibit 2 at 10:11).)

12. Trooper Irwin, took into account that this was "a black-colored vehicle, traveling the wrong way on I-70, with inoperable headlamps, and under the cover of darkness" and conducted a legal intervention with his vehicle, "striking [the Kia] on the front right quarter panel." (Doc. 18-1 at 3; Doc. 21 (Exhibit 2 at 10:11); *see also* Doc. 31 at 10 ("The Highway Patrol State police conducted a tactical vehicle intervention").)

13. Later, in response to an officer saying "you drove the wrong way," Bostic admitted, "I did, I didn't realize it though." (Doc. 21 (Exhibit 5 at 12:39).)

14. Bostic also said, "I admit I was driving crazy." (Doc. 21 (Exhibit 4 at 26:05, Exhibit 6 at 24:32).)

15. Bostic said with regard to the alleged aggravated assault of a law enforcement officer: "I wasn't really trying to hit you guys. I was really trying to play with you guys." (Doc. 21 (Exhibit

6

5 at 22:45).)

### *Foot Pursuit*

16. After officers disabled the Kia, Bostic immediately exited the driver's seat of the car and ran eastbound. (Doc. 18-1 at 3; *see also* Doc. 31 at 10 ("the driver . . . was apprehended by Kansas Highway Patrol after a short foot pursuit").)

17. Officers gave pursuit and identified themselves as police officers. (Doc. 18-1 at 1, 3, 11; Doc. 21 (Exhibit 4 at 20:25, Exhibit 6 at 18:53, and Exhibit 7 at 18:59) (showing the foot pursuit); *see also* Exhibit E at ¶¶ 3-4; Doc. 31 at 10.)

18. During the chase, Bostic fell to the ground and immediately got back up. (Doc. 18-1 at 1, 3.)

19. Officers commanded Bostic to "stop" and get "on the ground" at multiple points in the pursuit (Doc. 18-1 at 1, 3; Doc. 21 (Exhibit 6 at 19:14, 19:17, 19:31) (showing officers ordering Bostic to get "on the ground!"); *see also* Doc. 31 at 11 ("plaintiff was ordered to 'stop' by police").)

20. Bostic did not immediately comply with the orders. (Doc. 18-1 at 1, 3; Doc. 21 (Exhibit 6 at 19:35) (showing Bostic only going to the ground after getting tased).)

21. After the last such order, when Bostic still failed to comply, an officer announced to Bostic that Bostic was going to be tased. (Doc. 21 (Exhibit 6 at 19:35).)

22. Master Trooper Garcia tased Bostic with his KHP-issued taser, which shot two projectile probes out to conduct electricity through the target, Bostic, which was effective in causing Bostic to fall to the ground. (Doc. 18-1 at 1, 8, 10; Doc. 21 (Exhibit 6 at 19:35).)

23. An officer stated to Bostic the officer's present sense impression that "yeah we had to tase you, you wouldn't listen." (Doc. 21 (Exhibit 4 at 21:35, Exhibit 6 at 20:01, and Exhibit 7 at 20:08).)

24. KHP Lieutenant Gustavo Ramirez reviewed Master Trooper Garcia's deployment of his taser during the chase, noting that "[a]ll monitors were activated during this incident," "[t]here is no audio since [Trooper] Eddings [was] in training and wore the mic pack," and "[t]he Use of Force occurred outside of the patrol camera's view and is not visible." Lieutenant Ramirez also stated that "I observed no violations of KHP Policy and Procedure or Kansas State Law." Lieutenant Ramirez concluded that the "force used by [Master Trooper] Garcia was reasonable, appropriate, and necessary to take the resistant suspect into custody, protect himself, and prevent the suspect from fleeing." (Doc. 18-1 at 11; *see also* Exhibit G at ¶¶ 2-4; Exhibit E at ¶¶ 3-4; Doc. 18-1 at 16-22 (KHP's "Response to Resistance" policy)).

25. KHP's response-to-resistance policy describes "conducted energy weapons" (such as tasers) as "intermediate weapons." (Doc. 18-1 at 16-17, 19.)

26. KHP's response-to-resistance policy directs that officers deploying a conducted energy weapon should consider the following factors: (1) "The severity of the crime at issue"; (2) "Whether the suspect poses an immediate threat to the safety of the officer(s) or others"; and (3) "Whether the suspect is actively resisting arrest or attempting to evade arrest by flight." (Doc. 18-1 at 19.)

27. Officers restrained Bostic on the ground after he was tased in order to handcuff him. (Doc. 21 (Exhibit 4 at 21:14 and Exhibit 6 at 19:39); Doc. 18-1 at 1.)

28. Before the prongs of the taser probes were removed, Bostic said, "Wooooo! Take that out please. That shit hurts. That shit hurts, bro." (Doc. 21 (Exhibit 4 at 21:43, Exhibit 6 at 20:09, and Exhibit 7 at 20:15).)

29. Immediately afterwards, Officer Wood assisted in removing the prongs of the taser probes. Officer Wood used a minimal level of force and did not yank out the prongs. (Doc. 21

(Exhibit 6 at 20:26, Exhibit 7 at 20:32); *see also* Doc. 32 at 3 ("As for the removal of the taser prongs, the video shows Plaintiff asking to have the prongs removed and an officer responding to his request. The video does not show officers yanking out the prongs.").)

*Under Arrest*

30. A short time after arriving back at the highway, an Emergency Medical Technician ("EMT") from the Kansas City, Kansas Fire Department had arrived to check Bostic and the two passengers from the Kia. (Doc. 21 (Exhibit 5 at 03:21, Exhibit 9 at 29:02); Doc. 18-1 at 1, 9.)

31. An officer remarked to the EMT that, according to protocol, "we already got the prongs [of the taser] out." (Doc. 21 (Exhibit 5 at 03:52).)

32. Bostic did not appear to complain to the EMT on the scene of any particular pain, injuries, or discomfort. Officer Ridgley's body-worn camera footage and Trooper Ramirez's dash camera footage do not capture any such complaints to the EMT. (Doc. 21 (Exhibit 5 at 03:41, Exhibit 9 at 29:02).)

33. The EMT left shortly afterwards. (Doc. 21 (Exhibit 5 at 04:03, Exhibit 9 at 30:29).)

34. KHP Lieutenant Gustavo Ramirez checked over and took pictures of Bostic, who told Ramirez that both taser prongs had struck him in the chest. Bostic said, "They were both in my chest." (Doc. 21 (Exhibit 5 at 06:46, Exhibit 9 at 32:49); Doc. 18-1 at 1.)

35. Lieutenant Ramirez took pictures of the injuries on Bostic's chest caused by the taser prongs, which show a small amount of blood on his lower left abdomen and in the area of his breastbone. Bostic suffered only these minor visible injuries with no medical treatment required. (Doc. 18-1 at 1, 5-7, 9; Doc. 21 (Exhibit 5 at 07:11, Exhibit 9 at 33:37).)

36. Bostic was transported to the Wyandotte County Detention Center by Kansas City, Kansas Police Officer Corgiat and booked in the WCADC on February 11, 2024, at 12:30am for (1) Fleeing or attempting to elude a law enforcement officer, 1st conviction; (2) Aggravated

assault of LEO, Use of a deadly weapon; (3) Interference with LEO, Obstruct or resist in misdemeanor case; (4) Possession of stolen property, Value $1,000 to $25,000; and (5) Criminal possession of a firearm by a felon. (Doc. 18-1 at 12-15.)

37. Bostic pled guilty, was convicted, and was sentenced to four years in prison for resisting a lawful stop by fleeing from law enforcement officers in a manner that created a substantial risk of serious physical injury or death to other persons based on the events on February 10, 2024. (Exhibit D at 11, 14-17.)

38. Bostic pled guilty, was convicted, and was sentenced to seven years in prison for tampering with a motor vehicle in the first degree based on the events on February 10, 2024. (Exhibit D at 10, 14-17.)

39. Bostic remains in jail for these convictions, and is currently incarcerated in the custody of the Missouri Department of Corrections. (Exhibit A at 1 (including a list of active offenses and an empty list of completed sentences); Docket (showing Bostic's address for purposes of service in this case); Doc. 31 at 1 (same).)

## ARGUMENTS AND AUTHORITIES

### *Standard on Motion to Dismiss for Lack of Subject-Matter Jurisdiction*

Under Federal Rule of Civil Procedure 12(b)(1), a defendant may move to dismiss claims for lack of subject-matter jurisdiction. Plaintiff, as the party invoking the Court's jurisdiction, bears the burden of showing its existence. *Kline v. Biles*, 861 F.3d 1177, 1180 (10th Cir. 2017) (citing *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994)). "A court lacking jurisdiction cannot render judgment but must dismiss the cause at any stage of the proceedings in which it becomes apparent that jurisdiction is lacking." *Siloam Springs Hotel, L.L.C. v. Century Sur. Co.*, 906 F.3d 926, 931 (10th Cir. 2018).

***Standard on Motion to Dismiss for Failure to State a Claim***

On a Rule 12(b)(6) motion to dismiss, a court must accept as true all well-pleaded factual allegations in the complaint, but a complaint must also contain enough facts to state a claim for relief that is plausible on its face. *Smith v. United States*, 561 F.3d 1090, 1098 (10th Cir. 2009); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The court need not accept as true those allegations that state only legal conclusions. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Although the sufficiency of a complaint generally rests on its contents alone, the court may also consider: (1) documents that the complaint incorporates by reference, (2) documents that the complaint references if they are central to the plaintiff's claims, and (3) matters of which a court may take judicial notice, which includes court records in any related court proceedings. *Gee v. Pacheco*, 627 F.3d 1178, 1186, 1191 (10th Cir. 2010). At the motion to dismiss stage, court records of which the court takes judicial notice "may only be considered to show their contents, not to prove the truth of matters asserted therein." *Johnson v. Spencer*, 950 F.3d 680, 704 (10th Cir. 2020).

But when "a plaintiff attaches to, or incorporates into, a complaint a document upon which a claim is based, or when the complaint otherwise shows that the plaintiff has adopted the contents of the document" and the document "negates the plaintiff's claims," then "dismissal for failure to state a claim is warranted." 61A Am. Jur. 2d *Pleading* § 62 (2d ed. Feb. 2026 update); *see also GFF Corp. v. Associated Wholesale Grocers, Inc.*, 130 F.3d 1381, 1385 (10th Cir. 1997) (holding that "the [referenced] document controls when it is properly before the court" and "factual allegations that contradict such a properly considered document are not well-pleaded facts that the court must accept as true"); 5A Wright & Miller's Federal Practice and Procedure § 1327 & n.7, n.22 (4th ed. April 2026 update) (citing *GFF Corp.*, 130 F.3d at 1384-85).

Although courts have traditionally construed *pro se* pleadings in a liberal fashion, this

"does not relieve the plaintiff of the burden of alleging sufficient facts on which a recognized legal claim could be based." *Riddle v. Mondragon*, 83 F.3d 1197, 1202 (10th Cir. 1996). Similarly, courts do not assume the role of an advocate for the *pro se* litigant by constructing arguments or searching the record for potentially viable theories. *Garrett v. Selby Connor Maddux & Janer*, 425 F.3d 836, 840 (10th Cir. 2005). A *pro se* litigant is expected to construct his or her own arguments or theories and adhere to the same rules of procedure that govern any other litigant in this circuit. *Id.* at 840-41.

### Summary Judgment Standard

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *McCoy v. Meyers*, 887 F.3d 1034, 1044 (10th Cir. 2018). The court views the evidence and draws all reasonable inferences in a light most favorable to the nonmoving party. *McCoy*, 887 F.3d at 1044. "An issue is 'genuine' if there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way," and "[a]n issue of fact is 'material' if under the substantive law it is essential to the proper disposition of the claim." *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). When there is no genuine dispute of material fact on an essential element of the nonmovant's claim, then summary judgment is appropriate. *See Sports Unlimited, Inc. v. Lankford Enters.*, 275 F.3d 996, 999 (10th Cir. 2002).

"[W]hile courts must construe pro se pleadings liberally, pro se plaintiffs may not rely on conclusory allegations to overcome their burden." *Hastings v. Campbell*, 47 F. App'x 559, 560 (10th Cir. 2002) (citing *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991)); *see also McCoy*, 887 F.3d at 1044 ("Unsubstantiated allegations carry no probative weight in summary judgment proceedings."). Facts must be shown through affidavits, deposition transcripts, or incorporated

exhibits. *Adler*, 144 F.3d at 671. Relying on mere pleadings without supporting facts in the record is not enough. *May v. Segovia*, 929 F.3d 1223, 1234 (10th Cir. 2019).

> [T]he mere existence of a scintilla of evidence in support of the nonmovant's position is insufficient to create a genuine issue or dispute of material fact. To create a genuine issue, the nonmovant must present facts upon which a reasonable jury could find in favor of the nonmovant.

*Sinclair Wyo. Refin. Co. v. A & B Builders, Ltd.*, 989 F.3d 747, 765 (10th Cir. 2021) (citation omitted). The nonmoving party cannot create a genuine issue of fact by making allegations that are clearly unsupported by the record as a whole. *Scott v. Harris*, 550 U.S. 372, 378-81 (2007) (holding the court should "view[] the facts in the light depicted by [a] videotape" of the underlying incident).

### *Qualified Immunity Standard*

Qualified immunity protects from civil liability government officials whose actions do not violate clearly established statutory or constitutional rights of which a reasonable person would have known.[5] *Thomas v. Kaven*, 765 F.3d 1183, 1194 (10th Cir. 2014). Qualified immunity is an affirmative defense that can be raised in a motion to dismiss or in a motion for summary judgment. *Id.* (citing *Behrens v. Pelletier*, 516 U.S. 299, 309 (1996)). When a § 1983 defendant raises the qualified immunity defense, it creates a presumption that the defendant is immune from suit. *Janny v. Gamez*, 8 F.4th 883, 913 (10th Cir. 2021). To overcome this presumption, the burden shifts to the plaintiff to show (1) the defendant's alleged conduct violated a federal constitutional right, and (2) that right was clearly established at the time of the alleged violation. *Id.*; *see also Grissom v. Roberts*, 902 F.3d 1162, 1167-68 (10th Cir. 2018)

---

[5] Federal statutory rights enforceable under § 1983 are limited in number. *See City of Rancho Palos Verdes v. Abrams*, 544 U.S. 113, 124-25 (2005) ("a few § 1983 claims are based on statutory rights"). They are not relevant to this case, so the rest of this section refers only to "constitutional rights" as shorthand for the full phrase "statutory or constitutional rights."

("only if the plaintiff meets this two-part test does a defendant then bear the traditional burden of the movant" (comma omitted)). At the motion to dismiss stage, courts look to the defendant's conduct as alleged in the complaint, while at the summary judgment stage, courts look at the defendant's conduct according to the evidence in the light most favorable to the plaintiff. *Thomas*, 765 F.3d at 1194 (citing *Behrens*, 516 U.S. at 309). "The court has discretion to decide which of the two prongs of the qualified-immunity analysis to address first." *Grissom*, 902 F.3d at 1167 (citing *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)).

In brief, qualified immunity "protects all but the plainly incompetent or those who knowingly violate the law." *Kisela v. Hughes*, 584 U.S. 100, 104 (2018). In order to overcome Defendants' qualified immunity, Plaintiff must show not only that Defendants violated his federally secured rights, but also that objectively reasonable officials could not have thought the conduct constitutionally permissible. *Park v. Gaitan*, 680 F. App'x 724, 738 (10th Cir. 2017) (citing *Cortez v. McCauley*, 478 F.3d 1108, 1128 (10th Cir. 2007)); *see also Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (saying the clearly established right must have been "sufficiently clear that every reasonable official would have understood that what he is doing violates that right"); *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (saying clearly established case law must answer the "constitutional question beyond debate"). If a plaintiff fails to satisfy either prong of the qualified-immunity test, "a court must grant the defendant qualified immunity." *Grissom*, 902 F.3d at 1167.

Federal precedent offers two avenues for determining whether challenged conduct violates clearly established constitutional rights: "the plaintiff must show there is a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." *Colbruno v. Kessler*, 928 F.3d

1155, 1161 (10th Cir. 2019). "[G]eneral statements of the law are not inherently incapable of giving fair and clear warning to officers, but in the light of pre-existing law the unlawfulness must be apparent." *White v. Pauly*, 580 U.S. 73, 79-80 (2017) (citation omitted). "[T]he clearly established right must be defined with specificity." *City of Escondido v. Emmons*, 586 U.S. 38, 42 (2019). The Supreme Court "has repeatedly told courts not to define clearly established law at a high level of generality."

## I. The Eleventh Amendment bars Bostic's claims against Defendants in their official capacities.

"The Eleventh Amendment bars suits in federal court against a nonconsenting state brought by the state's own citizens." *Williams v. Utah Dep't of Corr.*, 928 F.3d 1209, 1212 (10th Cir. 2019) (citing *Edelman v. Jordan*, 415 U.S. 651, 662-63 (1974)). State officials share the state's immunity for suits against them in their official capacities. *Id.*; *see also White v. Colorado*, 82 F.3d 364, 366 (10th Cir. 1996). Because of the presumption that statutes do not abrogate this immunity, state agencies do not even count as "persons" amenable to suit under § 1983, and neither do state officials sued in their official capacities for monetary damages. *See Will v. Mich. Dep't of State Police*, 491 U.S. 58, 65-67, 71 & n.10 (1989).

A narrow exception allows a plaintiff to seek prospective relief against a state official for ongoing violations of federal law. *Muscogee (Creek) Nation v. Pruitt*, 669 F.3d 1159, 1166 (10th Cir. 2012) (citing *Verizon Md. Inc. v. Pub. Serv. Comm'n*, 535 U.S. 635, 645 (2002)). But claims for "retrospective declaratory relief" are barred. *Meiners v. Univ. of Kan.*, 359 F.3d 1222, 1232 (10th Cir. 2004). "Once effectively asserted, Eleventh Amendment immunity constitutes a bar to the exercise of federal subject matter jurisdiction." *Williams*, 928 F.3d at 1212.

Here, Bostic requests only monetary damages in the form of nominal, compensatory, and punitive damages (Doc. 31 at 8), which are barred by the Eleventh Amendment as asserted

against Defendants in their official capacities. Bostic does not request prospective relief.

Therefore, Bostic's claims against Defendants in their official capacities should be dismissed for

lack of subject-matter jurisdiction due to Eleventh-Amendment immunity.

**II.** **If any Eighth-Amendment claims remain, they should be dismissed because the proper excessive-force test to apply in this case arises under the Fourth Amendment only.**

Bostic cites the Fourth and Eighth Amendments in support of his excessive-force claims.

(Doc. 31 at 3.) But Bostic's excessive-force claims should be considered to be claims under the

Fourth Amendment only. (*See* Doc. 22 at 4.)

"Excessive force claims are cognizable under the Fourth, Fifth, Eighth, and Fourteenth

Amendments, depending on where in the criminal justice system the plaintiff is at the time of the

challenged use of force." *Vette v. Sanders*, 989 F.3d 1154, 1169 (10th Cir. 2021). "The choice of

amendment matters" because "each carries with it a very different legal test." *Porro v. Barnes*,

624 F.3d 1322, 1325 (10th Cir. 2010). "When an 'excessive force claim arises in the context of

an arrest or investigatory stop of a free citizen, it is most properly characterized as one invoking

the protections of the Fourth Amendment.'" *Vette*, 989 F.3d at 1169 (quoting *Graham v. Connor*,

490 U.S. 386, 394 (1989)). This includes "any force used leading up to and including an arrest."

*Estate of Booker v. Gomez*, 745 F.3d 405, 419 (10th Cir. 2014). And "[t]he Fourth Amendment

continues to apply up to the moment of a judicial determination as to 'whether there was

probable cause to charge [an arrestee] with a crime.'" *Geddes v. Weber Cnty.*, No. 20-4083, 2022

WL 3371010, at *4 (10th Cir. Aug. 16, 2022) (alteration in original) (quoting *McCowan v.

Morales*, 945 F.3d 1276, 1283 (10th Cir. 2019)).

In contrast, "prisoners already convicted of a crime who claim that their *punishments*

involve excessive force must proceed under the more restrictive terms of the Eighth

16

Amendment's 'cruel and unusual punishments' clause." *Porro*, 624 F.3d at 1325-26 (emphasis in original).

> And when neither the Fourth nor Eighth Amendment applies—when the plaintiff finds himself in the criminal justice system somewhere between the two stools of an initial seizure and post-conviction punishment—we turn to the due process clauses of the Fifth or Fourteenth Amendment and their protection against arbitrary governmental action by federal or state authorities.

*Id.* at 1326; *see also Colbruno v. Kessler*, 928 F.3d 1155, 1162-63 (10th Cir. 2019). For example, the Fifth or Fourteenth Amendments generally apply to "claims regarding mistreatment while in custody" brought by "those in pretrial confinement." *Colbruno*, 928 F.3d at 1162.

Here, Bostic complains of force "leading up to and including an arrest," *see Estate of Booker*, 745 F.3d at 419, prior to a judicial determination regarding probable cause, *see Geddes*, 2022 WL 3371010, at *4, so it falls under the Fourth Amendment. Although Bostic was technically a fugitive from house arrest (DSOF ¶¶ 1-3), Bostic does not complain about the conditions of pretrial or post-conviction confinement. So Bostic was – for purposes of his present claims – *effectively* a free citizen who complains of "excessive force . . . in the context of an arrest," which is a seizure subject to the Fourth Amendment. *See Vette*, 989 F.3d at 1169 (quoting *Graham*, 490 U.S. at 394).

Defendants' alleged actions did not occur in the context of post-conviction confinement. And Bostic does not complain that his post-conviction punishment for a crime involved excessive force. So the Eighth Amendment does not apply.

Bostic does not cite the Fourteenth Amendment in support of his excessive-force claims. Regardless, that amendment does not apply. Defendants' alleged actions did not occur in the context of pretrial confinement. They occurred in the context of arresting Bostic for criminal behavior, not in the context of the pretrial confinement (the house arrest) that Bostic was a

fugitive from. The arrest occurred for reasons unrelated to the pretrial confinement, and it even occurred in another state from where Bostic's pretrial confinement was located. Further, Bostic has not alleged or shown that Defendants knew of the pretrial confinement prior to deploying the taser or removing the taser prongs. So, for all these reasons, the Fourteenth Amendment does not apply.

Therefore, Bostic's excessive-force claim should be considered under the framework of the *Fourth Amendment*, and any remaining *Eighth-Amendment* claims against Defendants should be dismissed for failure to state a claim.

### III. Bostic's Fourth-Amendment claims fail under both Rule 12 and Rule 56 in light of the video evidence, which was incorporated or otherwise adopted by the Complaint.

"To state an excessive force claim under the Fourth Amendment, plaintiffs must show both that a seizure occurred and that the seizure was unreasonable." *Vette v. Sanders*, 989 F.3d 1154, 1169 (10th Cir. 2021) (emphasis omitted). Courts assess the reasonableness of a seizure using an objective standard, considering the totality of the circumstances. *Id.*; *see also Graham v. Connor*, 490 U.S. 386, 397 (1989) ("the subjective motivations of the individual officers [have] no bearing on whether a particular seizure is 'unreasonable' under the Fourth Amendment"). This totality of circumstances includes "the facts and circumstances as they existed at the moment the force was used, while also taking into consideration the events leading up to that moment." *Vette*, 989 F.3d at 1169. Courts judge the circumstances "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396. "[T]he right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Id.* And "[r]easonableness does not require that officers use alternative or less intrusive means if the conduct is otherwise reasonable." *Arnold v. City of Olathe*, 550 F.Supp.3d 969, 981 (D. Kan.

2021) (citing *Medina v. Cram*, 252 F.3d 1124, 1133 (10th Cir. 2001)).

The reasonableness analysis "requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham*, 490 U.S. at 396. The nature of the intrusion is generally measured by the amount of force employed, and courts can consider the extent of the plaintiff's injuries. *Turmon v. Jordan*, 405 F.3d 202, 207 (4th Cir. 2005). With regard to the countervailing governmental interests at stake, the Supreme Court identified in *Graham* three factors to guide the analysis: (1) the crime's severity; (2) whether the suspect poses an immediate safety threat to the officers or others; and (3) whether the suspect is actively resisting or evading arrest. *Id.* (citing *Graham*, 490 U.S. at 396); *Vette*, 989 F.3d at 1169 (citing *Graham*, 490 U.S. at 396); (*see also* DSOF ¶ 26).

"[T]he first *Graham* factor weighs against the plaintiff when the crime at issue is a felony, irrespective of whether that felony is violent or nonviolent." *Vette*, 989 F.3d at 1170. For the second and third *Graham* factors, courts consider whether those factors were met at "the precise moment" the officer employed the challenged use of force. *Id.* at 1170-71.

### A. The court can consider the body-worn camera videos under Rule 12 or, alternatively, under Rule 56.

The Court can consider the body-worn camera (BWC) videos under the motion-to-dismiss standard of Rule 12 because the Complaint incorporates those videos by reference or otherwise shows that the plaintiff has adopted the contents of those videos. *See* 61A Am. Jur. 2d *Pleading* § 62 (2d ed. Feb. 2026 update); *see also GFF Corp. v. Associated Wholesale Grocers, Inc.*, 130 F.3d 1381, 1385 (10th Cir. 1997) (holding that "the [referenced] document controls when it is properly before the court" and "factual allegations that contradict such a properly considered document are not well-pleaded facts that the court must accept as true"); 5A Wright

& Miller's Federal Practice and Procedure § 1327 & n.7, n.22 (4th ed. April 2026 update) (citing *GFF Corp.*, 130 F.3d at 1384-85). When documents incorporated by reference or otherwise adopted by the Complaint "negate[] the plaintiff's claims," then "dismissal for failure to state a claim is warranted." *See* 61A Am. Jur. 2d *Pleading* § 62.

And this applies to videos specifically. *Estate of Ronquillo ex rel. Estate of Sanchez v. City & Cnty. of Denver*, 720 F. App'x 434, 437 (10th Cir. 2017) (considering, on a motion to dismiss, video exhibits attached to the complaint); *Varnas v. Thompson*, No. 24-2193-JAR, 2024 WL 4625536, at *2 (D. Kan. Oct. 30, 2024) (considering BWC videos on a motion to dismiss "as the videos are referenced in the Complaint and contain information central to Plaintiff's claims"); *Gee v. Pacheco*, 627 F.3d 1178, 1186 (10th Cir. 2010) (allowing consideration under Fed. R. Civ. P. 12(b)(6) of material that a complaint incorporates by reference or references when it is central to the claims). *Contrast with Fuqua v. Santa Fe Cnty. Sheriff's Off.*, 157 F.4th 1288, 1298 (10th Cir. 2025) (not considering videos on a motion to dismiss because not attached, incorporated into, or referenced by the complaint).

Alternatively, the Court can consider the BWC videos under the summary-judgment standard of Rule 56. Video evidence can render a dispute regarding the facts not "genuine." *Scott v. Harris*, 550 U.S. 372, 378-81 (2007). The nonmoving party cannot create a genuine issue of fact by making allegations that are clearly unsupported by the record as a whole. *Id.* When a party's version of events is "blatantly contradicted by" and "utterly discredited by the record" (including the video evidence) such that "no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Id.* at 380-81. So the Court should "view[] the facts in the light depicted by the videotape." *Id.* at 381.

Here, Bostic incorporated BWC footage by reference or otherwise adopted it in his

Complaint, and that footage is central to his claims. (Doc. 31 at 11-12, 14.) As further discussed below, the videos negate Bostic's claims under Rule 12, *see* 61A Am. Jur. 2d *Pleading* § 62, and render his disputes regarding the facts not "genuine" under Rule 56, *see Scott*, 550 U.S. at 378-81.

**B. Defendant Wood did not use force against Bostic within the scope of the Fourth Amendment, or alternatively any intentional force was justified.**

1. *Defendant Wood did not use force at all against Bostic because removing the taser prongs did not objectively manifest an intent to restrain, coerce, or violently oppose.*

Not "every physical contact between a government employee and a member of the public" constitutes "a Fourth Amendment seizure." *Torres v. Madrid*, 592 U.S. 306, 317 (2021). The Fourth Amendment is not concerned with mere physical force, but with restraint, coercion, and violent opposition. Using common sense, if a person falls down and a police officer helps them up, the physical touch involved in the officer helping them up does not qualify as the type of "seizure" or "force" that the Fourth Amendment covers. In physics, "force" broadly means "[s]trength or energy exerted; the cause of motion or change; esp., physical power used in pulling, pushing, pressing, attracting, or repelling." *Force(1)*, Black's Law Dictionary (12th ed. 2024). Under that physics-based definition, grabbing (or seizing) someone's hand and helping them to their feet would be "force."

But under the Fourth Amendment, "force" more appropriately means "[a] violent physical action; physical compulsion or constraint of someone or something." *Force(4)*, Black's Law Dictionary (placing "excessive force" under this definition of "force"). Accordingly, case law discusses seizures and force under the Fourth Amendment in terms of coercion or violence. *A.M. v. Holmes*, 830 F.3d 1123, 1151 (10th Cir. 2016) (saying whether excessive force occurred depends on "the degree of physical coercion"); *Graham*, 490 U.S. at 396 (saying the Fourth

Amendment's reasonableness test applies to the use of "physical coercion" during an arrest); *Armijo v. Pacheco*, No. 14-cv-610, 2015 WL 13662794, at *6 (D.N.M. July 22, 2015) (citing *United States v. Davis*, 94 F.3d 1465, 1468 (10th Cir. 1996)) ("Consensual encounters do not implicate the Fourth Amendment. . . . However, coercion can turn an otherwise consensual encounter into a seizure."); *Cartia v. Beeman*, 122 F.4th 1036, 1043 (8th Cir. 2024) (saying "a gratuitous and completely unnecessary act of violence" against an already subdued and restrained suspect violates the Fourth Amendment).

Additionally, in *Torres v. Madrid*, the Supreme Court addressed the question of whether an attempted but failed arrest counted as a seizure. It found in that context that "[a] seizure requires the use of force *with intent to restrain*." *Torres*, 592 U.S. at 317 (emphasis in original) (limiting this holding to "only force used to apprehend"). "[T]he appropriate inquiry is whether the challenged conduct objectively manifests an intent to restrain, for we rarely probe the subjective motivations of police officers in the Fourth Amendment context." *Id.* So the *Torres* court focused on the intent objectively manifested by the conduct.

And the *Torres* case's focus on an objective "intent to restrain" comports with earlier case law, as restraint and coercion are simply two sides of the same coin. Restraint refers to stopping or prohibiting action, as a limitation. *Restrain(1)*, Black's Law Dictionary ("To stop (someone) from doing something, as by physical force; to prevent (a person) from a course of action"); *Restraint(2)*, Black's Law Dictionary ("Prohibition of action; holding back"; also placing "physical restraint" under this definition of "restraint"). And coercion refers to compelling *positive* action. *Coerce*, Black's Law Dictionary ("To compel by force or threat"); *Coercion(1)*, Black's Law Dictionary ("Compulsion of a free agent by physical, moral, or economic force or threat of physical force."). Accordingly, the two generally go together. Using

22

force to put someone in handcuffs, for instance, objectively manifests an intent both to coerce the individual to cooperate and to restrain the individual's movement.

The *Torres* opinion expressly limited its holding to "only force used to apprehend." *Torres*, 592 U.S. at 317. So it did not address the context of gratuitous violence against an already subdued and restrained suspect, and it also did not overrule cases holding that such conduct could constitute a Fourth Amendment violation. *See, e.g., Cartia*, 122 F.4th at 1043. Synthesizing the cases cited above, force under the Fourth Amendment means physical touch that objectively manifests an intent to restrain, coerce, or violently oppose.

Under this definition of force, the example given above of grabbing someone's hand and helping them to their feet would not qualify as force. This act of assistance would not objectively manifest an intent to restrain, coerce, or violently oppose the other individual. Similarly, the Supreme Court has stated "[a] tap on the shoulder to get one's attention will rarely exhibit" the required intent to implicate the Fourth Amendment. *Torres*, 592 U.S. at 317.

And similarly, here, Bostic requested assistance from the officers. He requested that the taser prongs be removed. (DSOF ¶ 28.) Defendant Wood assisted and removed the prongs. (DSOF ¶ 29.) The video does not show him yanking the prongs unnecessarily but rather simply assisting in their removal. (DSOF ¶ 29.) Bostic's Complaint claims otherwise in his Complaint. (Doc. 31 at 2-5, 12.) But the videos negate Bostic's claims under Rule 12, *see* 61A Am. Jur. 2d *Pleading* § 62, and render this dispute regarding the facts not "genuine" under Rule 56, *see Scott*, 550 U.S. at 378-81.

Given this context, Defendant Wood's actions did not objectively manifest an intent to restrain, coerce, or violently oppose Bostic. So Defendant Wood did not use legal "force" under the Fourth Amendment in removing the taser prongs. Therefore, he did not use excessive force,

since he did not use force in the first place.

2. *Equitable estoppel prohibits Bostic from claiming excessive force by Officer Wood because Bostic's own statements and actions induced the complained-of conduct.*

When Bostic requested for the prongs to be removed (DSOF ¶ 28), that communicated to the officers that he was okay with them doing so. Therefore, under equitable estoppel, he should be estopped from claiming that the officers committed a wrong by timely doing what he asked them to do. "Equitable estoppel prevents a party from taking a legal position inconsistent with an earlier statement or action that places his adversary at a disadvantage." *Spaulding v. United Transp. Union*, 279 F.3d 901, 909 (10th Cir. 2002). Equitable estoppel has four elements: (1) the party knew the facts at the time of the earlier statement or action; (2) the party intended to induce or reasonably appeared to intend to induce conduct in reliance on the statement or action; (3) the adversary must be ignorant of the true facts; and (4) the adversary must have relied on the party's conduct to his potential detriment in the current legal proceeding. *Id.*

Here, Bostic communicated that he wanted the officers to remove the prongs. (DSOF ¶ 28.) Applying each of the elements: (1) Bostic knew whether he truly wanted the officers to remove the prongs. (2) His request for the prongs to be removed reasonably appeared intended to induce conduct in reliance on that request (specifically, removing the prongs). (3) Defendant Wood was ignorant of Bostic's internal thoughts regarding the removal of the prongs, apart from what Bostic expressed verbally in his request. (4) And Defendant Wood's conduct in response to Bostic's request is now being used by Bostic as the basis for a lawsuit, which if successful would be to Defendant Wood's detriment. All four elements are met. Thus, under equitable estoppel, Bostic should be estopped from claiming that Defendant Wood committed a wrong by doing what Bostic requested or by doing so at the time Bostic requested it to be done.

3.  *The Fourth Amendment does not cover negligent use of force.*

Hypothetically, if Defendant Wood negligently used more physical force than necessary while trying to assist Bostic, that would still not qualify under the character of conduct governed by the Fourth Amendment. "Negligence is not a basis for liability under § 1983; liability must be predicated upon a deliberate deprivation of constitutional rights." *Williams v. Correct Care Sols.*, No. 19-3075-SAC, 2019 WL 2005920, at \*2 (D. Kan. May 7, 2019) (citing *Darr v. Town of Telluride*, 495 F.3d 1243, 1257 (10th Cir. 2007)).[6] Accordingly, "[t]he Supreme Court has not yet extended liability under the fourth amendment to include negligence claims." *Dodd v. City of Norwich*, 827 F.2d 1, 8 (2d Cir. 1987) (opinion on reargument). "[T]he Fourth Amendment prohibition on excessive force during arrest does not apply to unintentional or incidental applications of force." *Koetter v. Davies*, No. 2:07-CV-724, 2010 WL 3791482, at \*5 (D. Utah Sept. 22, 2010) (citing *Dodd*, 827 F.2d at 7-8). The objective manifestation of *intent* governs whether the Fourth Amendment applies. *Torres*, 592 U.S. at 317. "Accidental force will not qualify." *Id.* And negligence, by definition, is unintentional and accidental. *See Negligence(1)*, Black's Law Dictionary (excluding from the definition "conduct that is intentionally, wantonly, or willfully disregardful of others' rights"). So negligent use of physical force while trying to assist does not fall under the Fourth Amendment.

4.  *Any intentional use of force by Officer Wood was incidental to the initial deployment of the taser.*

Further in the alternative, if Defendant Wood removing the taser prongs counts as intentional force under the Fourth Amendment, that use of force was incidental to the initial

---

[6] *But see Hewitt v. City of Truth or Consequences*, 758 F.2d 1375, 1378 (10th Cir. 1985) (saying in dicta at only a high-level of generality, without providing any examples, that, hypothetically, "negligent conduct may under appropriate circumstances give rise to a constitutional deprivation remediable under section 1983").

deployment of the taser. So it should be analyzed in conjunction with the initial deployment of the taser. Although the removal of the taser prongs occurred after Bostic was restrained, the need for that use of force was predetermined at the time of the initial use of the taser. It was merely a delayed effect of the use of the taser itself. The taser prongs would have to eventually be removed. So the same justifications discussed below for the deployment of the taser by Defendant Garcia apply to the necessary aftermath of its deployment. Accordingly, if the removal of the taser prongs objectively manifested intentional force, it should be viewed in the context of Bostic's active resistance, evasion of arrest, and immediate safety threat posed at the time the taser was deployed.

For these reasons (including the *Graham* analysis below if the Court reaches it with regard to Defendant Wood), the Court should dismiss the claims against Defendant Wood for failure to state a claim. Alternatively, qualified immunity applies. It was not clearly established that the Fourth Amendment prohibited non-coercively removing taser prongs using minimal physical force upon a suspect's request following deployment of a taser by another officer. Or that negligent assistance in removing taser prongs would qualify as a violation of the Fourth Amendment. *See Dodd*, 827 F.2d at 8 ("The Supreme Court has not yet extended liability under the fourth amendment to include negligence claims."). So Defendant Wood is entitled to qualified immunity and the claims should be dismissed for failure to state a claim. *See Thomson v. Salt Lake Cnty.*, 584 F.3d 1304, 1313 (10th Cir. 2009) ("An officer using force in the course of a seizure of a citizen is entitled to qualified immunity unless the level of force violated clearly established Fourth Amendment law.").

Or, further in the alternative, the Court should grant summary judgment to Defendant Wood on these claims for these same reasons. Under Rule 56, in light of the evidentiary record,

Defendant Wood did not violate the Fourth Amendment and qualified immunity applies.

**C. The nature of Defendant Garcia's intrusion on Bostic's Fourth Amendment interests was only an intermediate use of force that resulted in minimal injuries.**

"[A]lthough . . . use of a taser entails a higher level of force than simply knocking someone back to the ground, a 'growing national judicial consensus' exists that the use of a taser in dart mode constitutes only an intermediate use of force." *Roell v. Hamilton Cnty.*, 870 F.3d 471, 484 (6th Cir. 2017). Intermediate force is a "broad category of non-deadly force" that "includes weapons such as police dogs and tasers." *Salazar v. Molina*, 37 F.4th 278, 283 & n.1 (5th Cir. 2022). Here, Defendant Garcia deployed a taser on Bostic using projectile probes, which constituted such a non-deadly, intermediate use of force. (DSOF ¶¶ 22, 25.) The Court can also consider the extent of Bostic's injuries. *See Turmon*, 405 F.3d at 207. Bostic suffered only minor injuries incidental to the use of the taser, which did not require medical treatment. (DSOF ¶¶ 30-35.)

In summary, Defendant Garcia used a non-deadly, intermediate level of force that resulted in minimal injuries.[7] This level of intrusion on Bostic's Fourth Amendment interests must be weighed against the countervailing governmental interests at stake under each of the *Graham* factors.

**D. The first *Graham* factor, severity of the crime, weighs in favor of Defendant Garcia because Bostic committed multiple felonies leading up to the arrest.**

"[T]he first *Graham* factor weighs against the plaintiff when the crime at issue is a felony, irrespective of whether that felony is violent or nonviolent." *Vette*, 989 F.3d at 1170.

---

[7] If the *Graham* factors apply to Defendant Wood's removal of the taser prongs, Defendant Wood removed the taser prongs upon Bostic's request, using minimal force. (DSOF ¶¶ 28-29.) And Bostic's injuries are the same. So Defendant Wood used a minimal level of force that resulted in minimal injuries.

Here, with regard to the severity of the crime, Bostic committed at least two felonies: (1) resisting a lawful stop by fleeing from law enforcement officers in such a manner that created a substantial risk of serious physical injury or death to other persons, and (2) tampering with a motor vehicle in the first degree. (DSOF ¶¶ 7-8.) He was sentenced to prison for four and seven years, respectively, for these offenses, and he remains in jail for these offenses. (DSOF ¶¶ 37-39.) At the time, officers were pursuing Bostic due to a suspected aggravated assault of a law enforcement officer – another felony (although Bostic's eventual plea deal did not include pleading guilty to that particular suspected felony). (DSOF ¶¶ 4-6, 36.)

What is more, based on the video evidence Bostic continued to commit yet another felony by fleeing from officers on foot. (DSOF ¶¶ 16-27.) As the Court has already recognized:

> The Court has viewed the BWC and dash cam footage submitted as exhibits to the [*Martinez*] Report, and finds that the Report is largely accurate in describing the incident as captured on the videos. Plaintiff has not stated a plausible claim for excessive force. Considering the reasonableness factors outlined in *Vette*, Plaintiff was driving a stolen vehicle, he led LEOs on a high-speed chase, he posed a threat to the safety of others by repeatedly swerving into oncoming lanes of traffic and driving the wrong way on an off ramp from I-70 with the headlights out, he refused to stop and had to be rammed by a police vehicle to forcibly stop his vehicle, *he immediately got out of the vehicle and took off running, he was pursued and ordered to stop, and he did not stop and surrender. Plaintiff appears to be actively attempting to flee at the precise moment the officers employed the challenged use of force, and the force ceased once his resistance ceased. While Plaintiff may have made the decision to surrender, his actions did not reflect that decision at the time he was tased.*

(Doc. 22 at 5-6 (emphasis added); *see also* Doc. 32 at 3 (similar).) And this constituted a felony under both Kansas and Missouri law. *See State v. Jesse*, 485 P.3d 187 (table opinion), 2021 WL 1836453, at *2 (Kan. Ct. App. May 7, 2021) (citing K.S.A. 51-2904 and *State v. Hudson*, 261 Kan. 535, 538-39, 931 P.2d 679 (1997)) (saying that resisting a felony arrest constitutes felony interference with law enforcement); Mo. Rev. Stat. 575.150(1)(1) (resisting arrest by fleeing),

(5)(1) (constitutes a felony when the attempted arrest was for a felony).

These felonies (including the suspected felony of aggravated assault of a law enforcement officer) make the first *Graham* factor, the severity of Bostic's crimes at issue, viewed from the perspective of a reasonable officer on the scene, weigh in favor of Defendant Garcia. *See Vette*, 989 F.3d at 1170.

### E. Going slightly out of order, the third *Graham* factor, active resistance or evasion of arrest, weighs in favor of Defendant Garcia based on the video evidence.

"[I]t's reasonable for officers to tase fleeing suspects." *Brown v. Giles*, 95 F.4th 436, 439 (6th Cir. 2024). As discussed in the previous section, the video evidence demonstrates that Bostic still at least had the objective appearance of "actively attempting to flee at the precise moment the officers employed the challenged use of force." (*See* Doc. 22 at 6; *see also* DSOF ¶¶ 16-27.) "While Plaintiff may have made the decision to surrender, his actions did not appear to reflect that decision at the time he was tased." (Doc. 32 at 3; *see also* Doc. 22 at 6 (similar).)

Tenth Circuit precedent establishes that "it is excessive to use a Taser to control a target without having any reason to believe that a lesser amount of force—or a verbal command— could not exact compliance." *Estate of Booker v. Gomez*, 745 F.3d 405, 424 (10th Cir. 2014). But the video evidence shows that Bostic "was pursued and repeatedly ordered to stop, and he did not stop and surrender," which provided Defendant Garcia with an objective reason to believe that a lesser amount of force or verbal commands could not exact compliance. (*See* Doc. 32 at 3; *see also* Doc. 22 at 6 (similar); DSOF ¶¶ 19-23); *see also Andersen v. DelCore*, 79 F.4th 1153, 1168 (10th Cir. 2023) ("When an officer lawfully uses force but an individual resists that initial use of force, we think it obvious that the officer may use a greater degree of force than would have initially been appropriate to subdue the individual, obtain peace, and ensure that the officers had control over the situation."). And the video evidence shows that "the force ceased

once [Bostic's] resistance ceased." (*See* Doc. 22 at 6; *see also* DSOF ¶¶ 22-27.)

Bostic claims otherwise in his Complaint. (Doc. 31 at 2, 11-12.) But the videos negate Bostic's claims under Rule 12, *see* 61A Am. Jur. 2d *Pleading* § 62, and render this dispute regarding the facts not "genuine" under Rule 56, *see Scott*, 550 U.S. at 378-81.

Further, even if Bostic hypothetically showed some objective, external signs of surrender, the use of intermediate force would still be justified here. After a "suspect . . . refuse[s] to surrender and instead lead[s] police on a dangerous hot pursuit" he cannot then "turn around, appear to surrender, and receive the same Fourth Amendment protection from intermediate force he would have received had he promptly surrendered in the first place." *Salazar*, 37 F.4th at 282-83. Even if the suspect appears to surrender, an officer may "have reason to doubt the suspect's compliance and still perceive a threat." *Id.* Although "a suspect's initial resistance does not justify the continuation of force once the resistance ceases," *McCoy v. Meyers*, 887 F.3d 1034, 1051 (10th Cir. 2018), an apparent surrender in such a context may not objectively indicate an end to the suspect's resistance.

Here, Bostic refused to surrender and instead led police on a dangerous hot pursuit. So even if he later turned around and gave some degree of an appearance of surrender (which, according to the video evidence, he did not), he would not be entitled to the same Fourth Amendment protection from intermediate force (such as a taser) that he would have received had he promptly surrendered in the first place. Following a dangerous hot pursuit, Bostic failed to comply with the officers' commands, giving further reason to doubt his compliance. So officers objectively had reason to perceive continued resistance.[8]

---

[8] The objective appearance rather than the subjective perception of the officers is determinative. *See Graham*, 490 U.S. at 397 ("the subjective motivations of the individual officers [have] no bearing on whether a particular seizure is 'unreasonable' under the Fourth Amendment").

All of this makes the third *Graham* factor, active resistance or evasion of arrest at the time of the use of force, weigh in favor of Defendant Garcia.

**F. The second *Graham* factor, immediate safety threat, weighs in favor of Defendant Garcia because Bostic's continued flight demonstrated a willingness to put the public and officers in danger.**

Past dangerous criminal activity can indicate a likelihood that the dangerous criminal activity may recur, posing "an ongoing risk to public safety." *United States v. Moran*, 503 F.3d 1135, 1142-43 (10th Cir. 2007). In the presence of such a risk, "a strong governmental interest" exists in detaining the suspect, solving the crime, and bringing the offender to justice. *Id.* That interest should be weighed against "the nature of the intrusion" under the Fourth Amendment. *Id.* "[T]he relevant inquiry is whether the officer used a justifiable level of force in light of the continuing threat of harm that a reasonable officer could perceive." *Salazar*, 37 F.4th at 283.

"[A] certain amount of force is obviously reasonable when a police officer arrests a dangerous, fleeing suspect." *Huang v. Harris Cnty.*, 264 F.3d 1141 (table opinion), 2001 WL 822534, at *9 (5th Cir. June 22, 2001) (citing *Ikerd v. Blair*, 101 F.3d 430, 434 (5th Cir. 1996)). "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396-97. Officers may "use significant force to subdue a resisting arrestee who poses an ongoing threat" or reasonably appears to pose an ongoing threat. *Matusak v. Daminski*, 165 F.4th 702, 710, 715 (2d Cir. 2026) ("it was not clearly established that officers could not strike or tase a suspect who, after fleeing from police, was resisting officers' attempts to place him in handcuffs and the officers reasonably believed he posed a threat to officer safety" even when that suspect was unarmed and lying face down on the ground at the time).

Here, Bostic had just feloniously led officers on a multi-state high-speed car chase in a reportedly stolen vehicle in such a manner that posed a danger to the public. (DSOF ¶¶ 4-15.) This also put the pursuing officers in danger due to the nature of a high-speed car chase. Bostic therefore demonstrated a willingness to act dangerously and erratically to evade capture. When the car Bostic was driving was immobilized, he continued to flee. (DSOF ¶¶ 16-27.) His flight never stopped until he was tased. (DSOF ¶¶ 4-27.) Bostic's dangerous criminal activity in fleeing officers therefore indicated a likelihood that dangerous behavior would recur during the continued flight, which posed an "ongoing risk to public safety." *See Moran*, 503 F.3d at 1142-43. Officers could reasonably believe that Bostic's present action of continuing to flee could reasonably lead to further public danger or further danger to the officers themselves. In other words, Bostic's present flight posed an immediate, ongoing risk to public safety and to the officers' safety. So "a strong governmental interest" existed in timely detaining Bostic, solving the crime, and bringing Bostic to justice. *See id.* Weighing that interest against the nature of the intrusion – here, the use of non-deadly force in the form of a taser with minimal injury– should weigh in favor of Defendant Garcia.

Therefore, the third *Graham* factor, immediate safety threat, weighs in favor of Defendant Garcia. So all three factors weigh in favor of Defendant Garcia. And because the factors overall weigh in favor of Defendant Garcia, the Court should dismiss Bostic's excessive-force claims against him for failure to state a claim.

Alternatively, qualified immunity applies. It was not clearly established that the U.S. Constitution prohibited using a taser on a noncompliant felony suspect that continued to lead officers on a dangerous hot pursuit and continued to resist arrest. So Defendant Garcia is entitled to qualified immunity and the claims should be dismissed for failure to state a claim. *See*

*Thomson v. Salt Lake Cnty.*, 584 F.3d 1304, 1313 (10th Cir. 2009) ("An officer using force in the course of a seizure of a citizen is entitled to qualified immunity unless the level of force violated clearly established Fourth Amendment law."); *Matusak*, 165 F.4th at 715 ("it was not clearly established that officers could not . . . tase a suspect who, after fleeing from police, was resisting officers' attempts to place him in handcuffs and the officers reasonably believed he posed a threat to officer safety").

Or, further in the alternative, the Court should grant summary judgment to Defendant Garcia on these claims for these same reasons. Under Rule 56, in light of the evidentiary record, the *Graham* factors weigh in favor of Defendant Garcia and qualified immunity applies.

## IV. **Alternatively, Bostic is not entitled to punitive damages when he cannot show any conduct was motivated by evil intent or was undertaken with reckless or callous indifference to his constitutional rights.**

Even if Bostic states a claim that survives summary judgment, Bostic is not entitled to punitive damages against Defendants for want of the requisite subjective intent. A § 1983 plaintiff claiming punitive damages must prove defendants' conduct either is "shown to be motivated by evil motive or intent" or "involves reckless or callous indifference to" his federal constitutional rights. *Searles v. Van Bebber,* 251 F.3d 869, 879 (10th Cir. 2001) (quoting *Smith v. Wade,* 461 U.S. 30, 56 (1983)). Barring pleading and proof that a defendant "either acted with malice or knew his actions were unconstitutional," a § 1983 plaintiff cannot pursue a claim for punitive damages. *See Jolivet v. Deland*, 966 F.2d 573, 577 (10th Cir. 1992).

Here, Bostic has not alleged or provided any evidence that Defendants acted with the required maliciousness, evil motive, or with reckless indifference to Bostic's civil rights, or that he subjectively knew his actions were unconstitutional under clearly established law. As a matter of law, Bostic cannot receive punitive damages. Therefore, even if Bostic states a claim that

survives summary judgment, the Court should grant partial summary judgment[9] to Defendants on Bostic's claims for punitive damages.

## CONCLUSION

For these reasons, Defendants request that the Court dismiss Bostic's claims against them or grant summary judgment to them on those claims. Specifically, Defendants request that the Court dismiss the official-capacity claims against them for lack of subject-matter jurisdiction due to Eleventh-Amendment immunity. If any claims under the Eighth Amendment remain, they request that the claims be dismissed for failure to state a claim because the proper excessive-force test to apply in this case arises under the Fourth Amendment only. They request that Bostic's individual-capacity claims be dismissed for failure to state a claim in light of qualified immunity based on the video evidence incorporated by reference or otherwise adopted in the Complaint. Alternatively, they request summary judgment in their favor in light of qualified immunity based on the evidentiary record, which includes the video evidence. Lastly, if any claims survive this motion, Defendants request that partial summary judgment be granted with regard to claims for punitive damages due to lack of the requisite subjective intent.

---

[9] Rule 56 of the Federal Rules of Civil Procedure allows for "partial summary judgment," not necessarily on whole claims, but on a "part of each claim or defense."

Respectfully submitted,

KRIS W. KOBACH
ATTORNEY GENERAL OF KANSAS

*/s/ Matthew L. Shoger*
Matthew L. Shoger, KS Bar No. 28151
Assistant Attorney General
Scott G. Nading, KS Bar No. 29665
Assistant Attorney General
Office of the Attorney General
120 SW 10th Ave.
Topeka, Kansas 66612-1597
matt.shoger@ag.ks.gov
scott.nading@ag.ks.gov
(785) 296-2215
Fax: (785) 291-3767
*Attorneys for Defendant Garcia*


CATHERINE L. HANAWAY
MISSOURI ATTORNEY GENERAL

*/s/ Adam J. Merello*
Adam J. Merello
D. Kan. #79326, #72420MO
Assistant Attorney General
615 E. 13th Street, Suite 401
Kansas City, MO 64106
(816) 889-5008
Adam.Merello@ago.mo.gov
*Attorney for Defendant Officer Wood*

35

<p style="text-align:center"><u>**CERTIFICATE OF SERVICE**</u></p>

I hereby certify that on this 28th day of April, 2026, the foregoing document was filed with the clerk of the court by using the CM/ECF system, which will send notice of electronic filing to the following:

Dilini Lankachandra
Unified Government of Wyandotte
    County/Kansas City, KS
Legal Department
701 N. 7th Street, Suite 961
Kansas City, KS 66101-3013
dlankachandra@wycokck.org
*Attorney for Wyandotte County Sheriff's Department, Interested Party*

I also certify that a copy of the above will be served by means of first-class mail, postage prepaid, addressed to:

Da'Jhon Amaria Bostic #1411355
Jefferson City Correctional Center
8200 No More Victims Road
Jefferson City, Missouri 65101
*Plaintiff, pro se*

<div style="margin-left:50%">

*/s/ Matthew L. Shoger*
Matthew L. Shoger
Assistant Attorney General

</div>